IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RSG, Inc., a South Dakota Corporation, R GROUP, INC., an Iowa Corporation, and RANDALL S. GOLDEN, an Individual, | ) ) ) ) ) | 8:06CV507 |
| Plaintiffs/ Counterdefendants, | ) ) ) | |
| v. | ) ) | MEMORANDUM AND ORDER |
| SIDUMP'R TRAILER COMPANY, INC., a Delaware Corporation, | ) ) ) | |
| Defendant/ Counterclaimant. | ) ) ) | |

This matter is before the court after a trial to the court and a jury. This memorandum supplements findings made on the record at trial in ruling on the parties' respective motions for judgment as a matter of law under Fed. R. Civ. P. 50.

This is an action for declaratory relief, damages, and equitable relief in connection with the purchase by defendant/counterclaimant Sidump'r Trailer Company Inc. ("the Buyer") of a trailer business from plaintiffs/counterdefendants RSG, Inc., R Group, Inc. and Randall Golden (hereinafter, collectively, "the Seller"). The parties entered into an Asset Purchase Agreement, Transition Services Agreement, Side Letter Agreement and Escrow Agreement (hereinafter, the "Contract" or "Contracts") to effect the sale.

The issues for resolution at trial were set forth in the pretrial order. *See* Filing No. 262. The Seller filed this action for a declaration that the Buyer had breached the Contracts by: (1) filing a claim for indemnification that prevented the Seller from recovering

$600,000 held in escrow; (2) failing to develop and sell a potential new product, the Tridump'r, and to pay royalties to the Seller; (3) failing to provide Randy Golden a workspace in which to develop R Star technology; and (4) failing to deliver three trailers to the Seller.

The Buyer asserted fraudulent misrepresentation, fraudulent concealment, and breach of warranty as affirmative defenses to the Seller's claims and also as counterclaims against the Seller.[1]  Specifically, the Buyer claimed that the Seller misrepresented that:  (1) it did not have any significant warranty expenses or any material warranty claims in connection with the business; (2) that the trailers generally, and specifically the rear impact guards on the trailers, conformed to Federal Motor Vehicle Safety standards; (3) that the trailers had a 17-second dump cycle and a 42-degree dump angle; (4) the cylinders and valves for the 2007 Sidump'r model were ready for market; (5) there had been no increase in employee compensation payable, or to become payable, to the company's employees; (6) they were not in violation of any environmental laws or regulations; (7) the acquired company assets had been maintained in full compliance with all laws, statutes, governmental regulations, or similar commands applicable to the business; and (8) the company inventories were adequate for the present needs of the business and were fairly reflected on the books of account for the business, stating items of inventory in accordance with the Modified Generally Accepted Accounting Practices ("Modified GAAP").  The Buyer contended that the Seller fraudulently concealed material information in connection with

---

[1]The Seller also asserted a negligent misrepresentation claim, but it was not included in the pretrial order and the court did not allow that claim to go forward at trial.

2

the above representations.[2]  The Buyer asserted that the above-listed statements or omissions also amounted to a breach of warranty.  Each party also asserted several equitable claims and defenses for resolution by the court.

After a two-week trial, both parties moved for judgment as a matter of law.  The Seller sought judgment in its favor on its claims and sought dismissal of the Buyer's counterclaims, asserting that it had proved an accord and satisfaction and further arguing that the Buyer had failed to prove the elements of breach of warranty with respect to adequacy of inventory, conformity to law, notice of warranty claims and compensation of employees.  The Seller further argued that the Buyer had failed to prove the elements of its claims for breach of fiduciary duty and indemnification, and had failed to satisfy the condition precedent of timely notice with respect to the indemnification claim.  The Buyer moved for judgment as a matter of law on the Seller's breach-of-contract claims.  It argued

---

[2]Specifically, the Buyer asserted that the Seller had a duty to disclose and failed to disclose the following facts:

1.  The Business had prior "cracking problems" and other significant warranty issues and claims for which it provided "change kits" at no charge and otherwise paid customers prior to Closing;

2.  Seller's trailers generally, and specifically, the rear impact guard of Seller's trailers failed to conform to Federal Motor Vehicle Safety Standards, laws and regulations;

3.  The 2007 Sidump'r Model did not function properly, its cylinders and valves did not work and sufficient safety stock did not exist;

4.  The 17-second dump cycle could only be achieved by exceeding warranty specifications for the component parts;

5.  The 42-degree dump angle can not be achieved under the current specifications;

6.  Seller promised various employees wage increases which were not disclosed to Sidump'r in violation of the APA;

7.  The inventory at the time of Closing was not adequate for the present needs of the Business, nor was it fairly reflected on the books of account of Seller;

8.  Seller was in direct violation of applicable environmental laws in that paint preparation chemicals were inappropriately discharged; and

9.  There were direct violations of fire regulations in that: (a) there was inadequate fire protection over the painting booth and surrounding areas; and (b) there was use of a wooden beam in the fire pit.

*See* Filing No. 262, Pretrial Order at 12.

that it was entitled to a judgment of dismissal on the Seller's claims because the Seller had not satisfied a condition precedent to the Contract in that it had not shown that its financials were true and accurate.

The court granted the motions in part, as further elaborated below. The court first found that the Seller was entitled to a judgment in its favor on its claim involving the escrow funds and the delivery of a Sidump'r trailer, but ruled in favor of the Buyer on the Seller's claims for failure to provide space and failure to develop a Tridump'r trailer. The court further found the Seller was entitled to a judgment of dismissal on all but two of the Buyer's breach of warranty claims. The court found issues of fact remained on claims for lack of compliance with the warranty of conformity with federal under-ride regulations and the warranty that there had been no material adverse changes in liabilities. The court further found in favor of the Seller on all of the Buyer's fraudulent misrepresentation and fraudulent concealment claims except the claim that the Seller had either misrepresented or concealed information about substantial or significant cracking problems. Those claims were submitted to the jury and the jury found in favor of the Seller on all of the claims.[3]

---

[3]Based on the terms of the Contract, the court found as a matter of law that the Seller warranted that the design of the Sidump'r trailer complied with the law, including federal under-ride protection regulations. The jury was asked, in special interrogatories, to determine whether the Buyer had proved that the design of the Sidump'r trailer did not comply with the law and, if not, whether it was reasonable and necessary to expend funds to comply with perceived violations of that law. Filing No. 296, Special Interrogatories at 1-2. The jury answered "no." *Id.*

The court further determined, as a matter of law, that the Seller warranted in Section 5.6 of the Contract, entitled "Absence of Certain Changes," that from September 30, 2005, to the date of the closing, the Seller had "carried on the Business only in the ordinary course, and there [had] not been (a) any change in the . . . liabilities . . . of the Business . . . other than changes which were both in the ordinary course of business and have not been, either in any case or in the aggregate, materially adverse." Filing No. 299, Final Jury Instructions at 22. The jury was asked to determine whether the warranty claims for pivot pipe cracks during that time period were changes in the liabilities of the business, whether they were in the ordinary course of business and whether the changes were materially adverse. Filing No. 296, Special Interrogatories at 2. Again the jury answered "no." *Id.*

Filing No. 296, Special Interrogatories (Verdict).  The court withheld entry of judgment pending the issuance of this opinion.

## I.  FACTS

### A.  The Contract

The parties executed four contracts for the sale of the business:  the Asset Purchase Agreement, Transition Services Agreement, Side Letter Agreement and Escrow Agreement.  *See* Trial Exhibit (T. Ex. 2); also found at Filing No. 47, First Amended Complaint, Exs. A - C.  The Seller's warranties are set out in Section 5 of the Asset Purchase Agreement.  *Id.* at 8-21.  In Section 5.6 of the APA, the Seller warranted that:

> Except as set forth on Schedule 5.6, since September 30, 2005, the Sellers have carried on the Business only in the ordinary course, and there has not been (a) any change in the assets, liabilities, sales or income of the Business or in the relationships with suppliers, customers or lessors of the Business, other than changes which were both in the ordinary course of business and have not been, either in any case or in the aggregate, materially adverse[.]

*Id.* at 9.

Section 5.13 provides that "the inventories are adequate for the present needs of the business and are fairly reflected on the books of account of Sellers, stating items of inventory in accordance with Modified GAAP, consistently applied with adequate allowance for excessive or obsolete inventories."  *Id.* at 13.  In § 5.20, the Contract provides that "[t]he Acquired Assets, when utilized with a labor force substantially similar to that currently employed by the Sellers at the Real Property are adequate and sufficient to conduct the Business as currently conducted by the Sellers."  *Id.* at 18.  In § 5.9, the Contract provides that the acquired assets "are in good condition and repair (reasonable wear and tear

excepted) and are adequate and sufficient to carry on the business as presently conducted." *Id.* at 11.

Section 5.8 (entitled "Conformity to Law") generally provides that, with certain exceptions set out in an attached schedule, the Seller had complied "with (a) all laws, statutes, governmental regulations and all judicial or administrative tribunal orders, judgments, writs, injunctions, decrees or similar commands applicable to the Business or any of the Acquired Assets" including zoning laws, but excluding "any occupational health or safety law, regulation or ordinance." *Id.* at 10.  The Buyer also warranted, again with exceptions listed in an attached schedule, that there had been "no changes in employee compensation since September 30, 2005," and that "the Sellers have no employment agreement, written or oral, with any currently active employee of the Business, including any agreement to provide any bonus or benefit to any such employee." *Id.* at 15.  In the attached schedule, the Seller disclosed that "R Group paid a $200 bonus to all employees on December 17, 2005 as a production incentive" and that it planned "to pay an end-of-year bonus of approximately $40,000 (total) to all employees." *Id.* at 48.

The Contract further contained a "no reliance" or "big boy" provision.[4]  Section 12.1 provides that "[t]he Buyer acknowledges and agrees that, except for the representations and warranties of the Sellers contained in Section 5 hereof, the Sellers are not making any other representations or warranties to the Buyer with respect to the Business" and states

---

[4]"[N]o-reliance clauses are called 'big boy' clauses (as in 'we're big boys and can look after ourselves')," and are generally enforced after "an inquiry into the circumstances of its negotiation, to make sure that the signatory knew what he was doing." *Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 724 (7th Cir. 2008).  The enforceability of the clause in the breach of contract context is not at issue since there is no dispute that the parties were sophisticated and were represented by counsel.  The "no reliance" clause is relevant to the issue of the reasonableness of reliance.

6

that the Buyer's sole remedies (other than for common law fraud) were set forth in the indemnification provisions of the Contract.  *Id.* at 34.  Section 10 of the Asset Purchase Agreement deals with indemnification.  *Id.* at 28-33.  In Section 10.1 the Seller agrees to indemnify and hold the Buyer harmless from claims, liabilities, losses, damages, costs and expenses "relating to or arising directly or indirectly out of (a) failure or breach by any of Sellers of any representation or warranty, covenant, obligation or undertaking made by any of the Sellers in or pursuant to this agreement (including Schedules and exhibits or any other statement, certificate or other instrument delivered pursuant thereto); (b) any claim, liability, obligation or damage" including cleanup for hazardous substance release, death or personal injury due to product defect; or claim or liability for employment or termination.  *Id.* at 29.  Monetary and temporal limitations on indemnification for personal-injury or death product liability claims are found in § 10.5.  *Id.* at 31-32.  The parties also agreed to place $600,000 in escrow to be held for claims under section 10.1.  See Filing No. 47, First Amended Complaint, Ex. B, Escrow Agreement.  Numerous schedules and detailed inventories and valuations of the assets of the company are attached to the Contract.  T. Ex. 2, Schedules; *see also* Filing No. 201, Index of Evid., Deposition Ex. 3, Asset Purchase Agreement at 41-50.  The value of the patents is listed as $9,750,000.  *See id.*, Schedule 3.1, Purchase Price Allocation.

In a Transition Services Agreement executed with the Asset Purchase Agreement, Randy Golden agreed to give the Seller 500 hours of his time and to "use best efforts in a commercially reasonable manner to work toward completing design and prototyping of Tridump'r."  Filing No. 47, First Amended Complaint, Ex. C, Transition Services Agreement at 2.  The Seller was obligated under the Asset Purchase Agreement to pay Golden a

royalty for each Tridump'r sold.  *Id.*, Ex. A, Asset Purchase Agreement at 6.  Section 2(b) of the Transition Services Agreement provides that the Buyer "shall also provide to Golden, as additional consideration for his services hereunder, a 2007 tandem Sidump'r, a 2007 Super Tri Axle Sidump'r and a Tridump'r, when and if such products become available (delivery to be made to Golden on a date that takes into account the Company's production levels and the demand of its customers)."  *Id.*, Ex. C, Transition Services Agreement at 3.

### B.  Evidence at Trial

Randy Golden, the former owner of Sidump'r, testified that he has a high school diploma and some training as a mechanic.  He formerly owned a bike shop, an automobile upholstery business, and an underground-fuel-tank-cleanup business.  In 1995, he began to design and build a side-dump trailer.  He hired an engineer and obtained a patent on his design.  In 1998, he bought a factory and developed a second and third prototype of the trailer.  He formed two corporate entities, R Group, Inc. (d/b/a Sidump'r), and RSG, Inc.  RSG, Inc. owned the factory and Golden, personally, owned the patents.[5]  Golden testified that sales increased from 7 trailers in 2000 to 282 trailers in 2005.

In 2003, he began to develop a concept for the "lightest, fastest" rear-discharge trailer and patented it as "R Star Technology."  He invested $200,000 in developing the new product in consultation with Alpine Engineering.  Because he wanted to pursue other ventures and did not like to manage a large number of people, Golden decided to sell the business sometime in 2003.  He hired Darin Good as his broker for the sale of the business, the patent, and the real estate.  He hired Jennifer Thompson and Nick Van Pelt

---

[5] Accordingly, on the Seller's side, three entities were involved in the Contract to sell the business: Randy Golden, individually; RSG, Inc.; and R Group, Inc.

in 2004 so that he had sufficient management in place before selling the business.  In the Spring of 2005, Darin Good found a number of potential buyers.  Golden testified that he received several offers in the amount of approximately ten million dollars, but could not come to terms with the parties.

Golden had continued to refine the design of his Tridump'r product that would dump from side to side and from the rear.  One potential buyer, Gemini Investors, was willing to compensate him for the Tri-dump'r technology.  Golden's first contact with the company was through a conference call on September 29, 2005.  Mike Monroe and Molly Simmons represented Gemini Investors.  The parties executed a letter of intent on October 21, 2005.  Golden testified that Gemini's representatives stated that they had the capital to take the company to the next level and had the money to develop the Tridump'r trailer.  They told him they had a factory in Houston and could market overseas.  The Buyer had retained Timepiece Capital to lend expertise to the transaction, because Gemini Investors lacked experience with manufacturing.  The parties agreed on a purchase price of 12 million dollars, less the working capital of $1,593,000 for inventory minus liabilities.

Representatives of Gemini Investors and Timepiece Capital conducted due diligence prior to the sale.  Monroe and Simmons came to the factory in October of 2005.  Golden's team of lawyers and accountants met with Gemini representatives in late October of that year.  Bill Jancosko of Timepiece Capital, an accountant, later spent five days at the factory doing due diligence.

Golden further testified that he did not keep accurate records of warranty claims.  He testified that Susie Lutz, who worked with his tax accountant, used statements in preparing his income tax returns that did not reflect any warranty payments as a

component of sales.  He never requested a compilation of warranty claims, but testified that there had been discussions with the Buyer about computing the warranty claims.  On Nov. 21, 2005, Golden met with Starkle, Jancosko, and the bankers of High Point Capital. The evidence shows that High Point Capital was reluctant to finance the purchase because of sloppy accounting.

Golden stated that he first learned of a pivot-pipe cracking problem with the trailers on October 27, 2005.  He testified he discussed this during due diligence in early November of 2005 with Bill Jancosko, in the presence of Jennifer Thompson.  He did not keep track of warranty claims for each trailer.  He testified that he had a short warranty because he knew that contractors frequently would overload the trailers.

Golden testified that one warranty claim that Fall had involved an overload situation—the trailer was limited to a 25-ton payload and the user was running 40 tons and hauling off-road.  With respect to the claims of cracking, he stated that when he received pictures of the occurrence, he called Alpine Engineering, called the factory, and had an in-house engineer, Jessie Effas, begin working on the problem.  He also contacted his larger customers to see if they had experienced any similar problems.  The Buyer's representatives visited him on November 1, 2005, but he did not tell them of the complaint because he was not sure what the issue was at that time.  Between November 8, 2005, and November 12, 2005, the engineer at Alpine Engineering told Golden that the problem had been found and reported that it was an improper burn of the weld in the area around the pivot pipe.  Golden testified he did not have confidence in Alpine's suggested remedy for the problem and instead, he made a design change and implemented it, using a longer neck design, on November 30, 2005.

10

He further testified that he and Jennifer Thompson discussed these issues at a meeting with Michael Starkle. At the time, Starkle had three or four pages of questions regarding due diligence. Golden testified that he discussed the hinge box cracks and the repairs by Jessie Effas. Golden informed Starkle of the design changes and they both looked at the cracking solution. Golden testified that he and Starkle spent about twenty minutes discussing the issue. He testified that he thought it was important to tell the Buyer about the design change. He did not think it was a design problem, but wanted to make a better machine. He also instructed Jennifer Thompson to tell the Buyer about the design change. Twenty trailers were produced with the new design.

Importantly, Golden testified that he gave the Buyer's accountants full access to his records and gave them the name of his consulting engineers, Alpine Engineering, in Utah. The evidence shows the Buyer never contacted the engineering firm. Golden also testified that pivot-pipe cracking complaints were not outside the ordinary course of business.

With respect to employee compensation, Golden testified that he hired Nick Van Pelt as a manager in November of 2005 and agreed to pay him $65,000 for 2006, plus healthcare. He stated that he had no employment agreements with any other employees and made no changes in compensation to employees prior to closing. He paid an end-of-year bonus of $40,000 that was disclosed to the Buyer in the Agreement. He further testified he had not promised the employees any wage increase. Golden testified that he continues as a minority shareholder and owns a 5% interest in Sidump'r.

With respect to the adequacy of inventory, he testified that from January 10, 2006, to March 31, 2006, the company produced 65 trailers, which was more than his company had produced in the first quarter of 2005. He stated that the Company made a profit in the

11

first quarter of 2006.  He also stated that the valves and cylinders would work and that new valves could be purchased for the cylinders.

Golden testified that an environmental assessment of the site was performed before the sale and he denied that any paint chemical had been drained into the creek.  He testified they used a biodegradable surfactant.  He testified that he knew that there was a problem with the fire suppression system in the paint booth and disclosed the problem in the schedule attached to the Asset Purchase Agreement.

He also testified that, at the time of trial, he did not know or believe that the trailers did not comply with the federal under-ride regulations.  He had not received any written demand for indemnification from the Buyer for damages as a result of any noncompliance. Golden conceded, however, that if he had been provided proper notice, he would owe for the federal under-ride claims under the Contract.

The parties signed the Asset Purchase Agreement, along with the Transition Services Agreement and Escrow Agreement on January 10, 2006.  Gemini Investors and Timepiece Capital, both investment fund companies, formed a new corporation, Sidump'r, Inc., in order to effect the sale and the Seller's assets were sold to that company.  Golden was represented in the transaction by the law firm of McGrath North, and the Buyer was represented by the Bigan & McCutchen law firm.  Golden testified he delivered all the written documents, warranty deeds, assigned patents, etc., to the new entity.

Golden testified that the parties had agreed on a launch date of January 2007 for the Tridump'r Trailer.  Under the Transition Services Agreement, Golden was to be provided a $2,500 royalty for each Tridump'r sold for 3 years.  *See* T. Ex. 602.  Golden testified that he tried to perform under the Transition Services Agreement.  The Buyer paid

him the $60,000 provided in the Agreement, but did not pay him $25,000 per year for 2006 and 2007. He testified that the Buyer promised him work space and equipment in the Transition Service Agreement. He needed a 60-foot by 25-foot work space to develop the R Star technology. He testified that he requested the space but it was not provided to him. Golden testified that the Buyer did not develop the Tridump'r and later kicked him out of the factory. On July 10, 2006, the Buyer changed the locks at the factory. With respect to the damages that are due to him for the Buyer's alleged failure to deliver a tandem Sidump'r trailer, he stated that he seeks the base price of $107,000 only.

Golden testified that $600,000 was set aside in the escrow agreement for obligations that related to warranties. The Asset Purchase Agreement also provided for a true-up. He testified he had estimated the net working capital at closing was approximately $1,439,000 but the Buyer disputed that assessment. *See* Ex. 606 & Ex. 339, purchase price adjustment proposal. Ultimately, the parties negotiated, arriving at $26,599.45 as the final figure for the true-up. *See* Ex. 639. On June 23, 2006, Golden and Jancosko signed the true-up. Golden tendered the money due under the true-up and the Buyer accepted it. Nothing indicates the check was cashed under protest.

Golden also testified that after the business was purchased, the Buyer hired new people and the welding "went downhill." In mid-to-late March of 2006, he became angry and informed the management of his dissatisfaction. In the Summer of 2006, Golden received an indemnification demand from the Buyer. *See* T. Ex. 115. Golden then filed this action to collect the funds held in escrow.

Michael R. Starkle, the President of Timepiece Capital ("Timepiece"), also testified at the trial. Starkle has a Bachelor of Arts degree in American History from Harvard

13

College.  Timepiece  is an investment company that acquires businesses. He testified he has worked on 5 or 6 buyer-side transactions and that Timepiece generally looks for businesses that are already doing well and are positioned to grow.  He testified that the cost of goods sold and warranty expense are important considerations to him and the warranty versus the cost of goods sold gives the buyer an idea about the quality of a product.  He has partnered with Gemini Investors before and has worked with David F. Millet, Michael Monroe and Molly Simmons of Gemini.

On September 2, 2005, he had a conversation with the broker, Darin Good, who had put together a descriptive memo about the company. *See* Ex. 30.  There had already been discussions between Gemini and Golden before Timepiece  became involved.  He stated that he was told the reason Golden was selling was that he had an idea for another product in the agricultural market and the company had outgrown Golden's management style.

Starkle recounted a conversation with Golden in early November of 2005, in which Golden told him that Golden had a great product, a good price, the best materials, a proven design and a regional business with room to grow nationwide.  He testified that he was also was told that Golden's product had the fastest dump speed in the industry and the highest quality steel for the frame and truck.  Starkle testified that Golden further told him his trailers were the best in the industry and were affordable relative to the competition.

Starkle called customers and also spoke to Golden and to Darin Good.  Generally, the message he took from the conversations was that the Sidump'r trailer was a good product, was well priced, and presented a good opportunity.  *See* Ex. 217, Monroe's handwritten notes dated 9/2/2005 to 11/16/2005 at 6.  Starkle testified that he personally contacted five or six customers.  *See* Ex. 28, e-mail regarding customer call sheets.

He testified that he was part of the due diligence team on this deal.  As part of due diligence, he interviews the owner, talks to customers, does market research, and reviews records of the company.  Starkle testified that he visited the plant several times prior to the closing.  He was there for two days in early November 2005 with Bill Jancosko, Timepiece's chief financial officer, and Michael Monroe, the President of Gemini, and they spoke to Golden, Jennifer Thompson and the Seller's accountants.  He met with the company's bookkeeper, Susie Lutz, and John Seighigh, a Certified Public Accountant (CPA"), and had the impression that the CPA was part of the team.

Starkle also testified that, although he is not an accountant, he is familiar with GAAP and can read and understand financials.  He testified he used Golden's financials to value the company.  He stated that he was aware that Golden's books were unconventional and did not comply with GAAP, and stated they were less than he would expect from a good company.  He characterized the books as a mess.  He acknowledged that the agreement was modified to define GAAP and to accommodate the nonconforming financials.  He stated that the financials did not disclose discounts or adjustments against sales invoices for warranty claims.

He testified that he received no information that the warranty claims were inaccurate.  His impression was that warranty claims were not an issue.  He stated there was no discussion about current design problems, recent cracking or recent frame cracking, although there was some discussion about structural members and an old problem that had been fixed.  He was told that in the early days, there had been tub and frame cracking but the problem was solved when the company went to different steel.  He also stated that he understood that the historical problems with the trailer had typically

15

involved paint and the cylinder.  He didn't think the problems were a big deal because the cylinder manufacturer had a short warranty of six months and the plan was to go to a new cylinder and to rework the hydraulics "to make it bullet proof" for the 2007 model, which was to be introduced in early 2006.  He understood that the testing and design of cylinder and valve were ready to go and that it was an improvement.  He acknowledged that he was told of failures related to overloading.  He also testified that the Tridump'r was a good idea.

He stated that the representations and warranties were necessary because due diligence cannot cover everything and purchasers have to rely on representations and warranties from the Seller.  He further stated that a true-up typically involves inventory issues, accounts receivable, payables, and payroll.  It was necessary to get a number for the true-up after closing because the parties close a deal based on an educated guess.

After the sale, he was not part of the day-to-day operation of Sidump'r, but was on the Board of Directors.  He stated that the company became aware there was a fundamental flaw in the pivot tube gradually over the course of the first part of 2006.  By June 30, 2006, the company was aware of the problem, but did not know the extent of it.  He testified that the company's earnings in the first year exceeded expectations.  The company is now in receivership.

William Jancosko, the Chief Financial Officer of Timepiece Capital, also testified at the trial.  He is a Certified Public Accountant with a Bachelors degree in accounting from Penn State and an MBA from the University of Pittsburgh.  He stated that in doing due diligence, he reviews the records of the business, the balance sheet, income statements and supporting documentation.  He testified that he cannot look at all the records, and does the same thing that auditors do—sample tests the records.  He performs an overall

analysis, checking for business risks and then analyzes the risks.  In doing so, he looks for "red flags" or for business risks that his company would not want to take.  He stated that his company buys about six to twelve business reviews before they even go to due diligence.

From Jancosko's perspective, the financials are the most important component of the process.  He visited the plant in November of 2005 to conduct due diligence and was there for five days.  He checked finances and spreadsheets, verified and tested accounts and sampled customer and vendor invoices.  He testified that Jennifer Thompson provided these documents to him.  He gave Thompson ten or twelve invoice numbers or dates, she pulled the documents, and he traced them back in detail.  He testified he thought the financials were "okay."  Further, he testified that Timepiece generally looks at businesses worth less than 20 million dollars and that it is not unusual to find that companies that size do not comply with GAAP.  He stated he expects the warranties and representations to be true.  He testified that warranty claims generally increase over time and that it is not unusual to see the warranty claims go up as the market matures.

He testified that he has never reviewed all the records and acknowledged that Golden offered to let him look in Golden's computer, but he declined because "it wouldn't really help."  He further testified that Golden's system was not very organized.  He also testified that he spoke to Golden's financial people and that Golden used an outside CPA.  Jancosko had no recollection of conversations about the warranty expenses during his first trip.

He stated that he reviewed warranty expenses on his second due diligence trip.  *See* Ex. 50.  He stated he had no idea that Golden was adjusting sales costs to offset for

17

warranty expenses.  The evidence shows, however, that the Buyer had been provided an invoice that showed a $24,000 adjustment for warranty.  *See* Ex. 927.  He testified that a warranty expense transaction this large would be of great concern to him.  He also testified that Golden had never told them about any recent pivot-pipe cracking or that he was still designing the cylinder and valve.  He also testified that he was concerned about future warranty expenses.  In the agreement, the parties set up a warranty reserve of $50,000. He did not negotiate the warranty reserve.

Jancosko testified that he was part of the company after the closing and he set up the new company's internal accounting system.  At some point, he became aware the company planned a wage increase.  He testified that Golden had told employees prior to closing that they would get a new rate of pay and that he was not aware of Golden's memos until Thompson showed him her copy.  *See* T. Ex. 6, Memorandum dated 9/23/05 to all employees from Randy Golden; T. Ex. 116, Memorandum dated 11/3/05 to all employees from Randy Golden; T. 117, Memorandum dated 12/23/05 to all employees from Randy Golden.  The Buyer had wanted to increase wages and benefits, but wanted to do it on its own.  He acknowledged, however, that he knew the employees were being paid under-market wages and testified there had been some discussion about the fact that they were losing employees to an ethanol plant with better pay.

He also testified that he was at the plant for fourteen days to figure the true-up.  *See* Ex. 72, e-mail regarding true-up analysis; Ex. 639, Executed Purchase Price Adjustment Agreement.  He worked with the auditors and reviewed December 2005 invoices to calculate the sales that were excluded from the deal.  In the true-up, the Buyer did not

reserve the right to pursue any other claims.  He also testified that he observed the inventory after the sale and that he thought there was adequate inventory at the close.

Michael Monroe, who formerly worked for Gemini Investors, also testified.  He was a senior associate with the company during the sale in question.  He has a Bachelors degree in Finance from Notre Dame.  He stated that Gemini Investors is a limited partnership that manages investment funds for approximately ninety higher-net-worth investors.  His first connection with the venture was a phone conversation with Darin Good in late August of 2005.  After he signed a confidentiality agreement, he received an e-mail with information on Sidump'r Trailer on September 28, 2005.  *See* T. Ex. 30.  The information included June 2005 financials.  On September 30, 2005, he talked to Good about production levels and the status of negotiations with the proposed transaction.  He stated that there was good production of the Sidump'r in 2005.

His role in the due diligence was to handle financials, market research, interviews with management, and customers interviews, as well as insurance, environmental, and legal elements.  He testified that he made several trips to the plant and had conference calls with all of the principals.  He stated, however, that Jancosko was the principal financial due diligence person and that Jancosko had looked at income statements and balance sheets and "sample tested" to determine that the statements were accurate.  Monroe had no information that the financials were not accurate.

He testified that he had participated in a conference with Starkle, Good and Golden.  Golden told them his trailers were the highest quality in the industry, and characterized them as the workhorse of the industry, and as "a Cadillac at Chevy price."  He also testified that Golden told him that the Sidump'r had a 42-degree dump-angle, which is better than

19

other trailers.  He further testified that Golden also stated that the speed of the dump-cycle was 17 seconds, which was the fastest in the industry.  Golden also told the Buyer that contractors like the Sidump'r trailer because they can do more work with these trailers. Monroe stated that he viewed the marketing of Tridump'r as a complement to the Sidump'r and that it was a product that could compete with the rear-dumper business.  His understanding of the status of the Tridump'r was that Golden had designed it and that Alpine was working on it and that the computer-assisted design ("CAD") drawings were complete.

He did not recall any discussion of the rear push block or compliance with federal regulations.  Golden also told them that historical problems with the Sidump'r were mostly cylinders and paint and the cylinder problems were mostly due to operator error.  Golden also told them he had a new cylinder that would be better.

He acknowledged that there had been talk about a new design for cylinders and valves.  He thought the status was that the 2007 models were designed and ready for production.  He stated that Golden used outside engineers and had hired Alpine Engineering, who had reviewed and approved the designs for the product.  Monroe testified that the new cylinder and valve were put in production starting in 2006 for the 2007 models.

Monroe visited the production facility with Molly Simmons on October 5, 2005, and met with Golden and Jennifer Thompson.  He and Golden discussed the use of Stress Flex Technology to insure integrity of the design.  He also testified that he and Golden discussed past problems, including problems in the early years with cracking, and that

Golden said he had switched to Domex Steel and Stress-Flex technology and there was no longer an issue.

In late October of 2005, Monroe sent Golden an e-mail about the timeline for the transaction and included a due diligence request list.  *See* T. Exs. 130, 131, and 132, e-mails.  He stated he asked for invoices because of the disarray of the books, to confirm component-pricing instructions, and because he wanted Jancosko to confirm the income and cost assumptions.

Monroe again visited the plant on November 1 through 5, 2005, with David Millet, Mike Starkle, and Bill Jancosko.  They met with Thompson, Golden, and the accountants.  They again discussed the quality of the product and the 17-second dump cycle.  They also talked about the history of problems and Golden told them the cracking problems had been solved.  They did not discuss any new complaint of pivot pipe cracking.  They only talked about the cylinders and valve problems.

Monroe made telephone calls to some customers and was told the product was good.  Customers reported no recent problems with products, although they recalled cracking problems in the early years.  Monroe testified he was given no information about any design problem other than cylinder and valve.  There was no discussion of cracking, except with respect to earlier problems.  Monroe stated he was not given any information about design changes.

Monroe further testified that if he had known about the cracking problem, he would not have recommended closing the deal.  He stated that the fact that the cylinder and valve had not been tested and Golden was ordering older valves would have completely

changed the profile of the investment.  He was never shown an invoice that showed a warranty adjustment.

Monroe also testified that High Point Capital declined to offer financing for the deal. *See* Ex. 307, e-mail correspondence.  He stated that the banker who declined the transaction was concerned about the financial reporting system, the fact that the business is cyclical, and the lack of a management team in Nebraska.  He testified that the problem with the transaction was that the records were a mess.

Monroe also testified the "no reliance" provision (section 12.1 of the Asset Purchase Agreement) was a negotiated clause in the transaction.  He stated that there were six drafts of the agreement.  The Buyer had no engineering firm for the company at first, but later hired Alpine Engineering.  Monroe testified that he never talked to Alpine Engineering before the closing.

He testified he was part of the operations of the new company for three to four weeks and Molly Simmons took over after that.  He was on the Board of Directors of the new company from January 2006 until he resigned from Gemini in August of 2008.  He received information about wage increases while on the Board.  With respect to wage issues, he testified that he would not have recommended closing if he had known there was a pay increase.

He testified he relied on the oral statements of Golden and Thompson and on the written information by Golden, Thompson and Good.  He stated that in any asset purchase transaction, it is important to have a warranty that a product conforms to the law and that financial statements are true and correct.

Monroe testified that Golden knew about three trailers with pivot-pipe cracking problems at the time of the closing. He testified that the design flaw in the trailer became clear to the Buyer in October to December of 2006. The buyer had 26 units with pivot tube cracking. In July of 2006, the company agreed there was a design flaw. It hired an engineer in October of 2006. He testified, however, that the company continued to use the design after June 2006.

He also stated that Golden told him that employees were underpaid by $1.50 to $2.00 an hour. Later he was told by the accountant that employee compensation was 10% to 20% under market.

Mark Taylor testified as an expert in the case. He was asked his opinion as to the propriety of the accountings for warranty costs. He stated that the Seller had not properly accounted for its warranty costs and obligations in its financial statements, but that a user of the Seller's financial statements for the years 2003 through 2005, with a reasonable degree of accounting knowledge and business knowledge of manufacturing, would have noticed the absence of warranty expenses in the income statement and warranty liabilities in the balance sheet. Further, he testified that a user of financial statements with fundamental knowledge of accounting, auditing and business would notice the glaring absence of an independent accountant's report accompanying the financial statements. He concluded that a reasonably informed user of financial statements would have and should have treated the Seller's financial statements as unreliable. He testified that he was bewildered by the Buyer's failure to demand the involvement of an independent accountant to perform an audit or review of the Seller's financial statements.

23

## II.  DISCUSSION

### A.  Law

#### 1.  Legal Claims

Under Rule 50 of the Federal Rules of Civil Procedure, judgment as a matter of law should not be granted unless "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1).  In applying that standard, the court is to "draw 'all reasonable inferences in favor of the nonmoving party without making credibility assessments or weighing the evidence.'" *First Union Nat'l Bank v. Benham*, 423 F.3d 855, 863 (8th Cir. 2005).  A reasonable inference is one that may be drawn from the evidence without resort to speculation.  *Id.*  "Judgment as a matter of law is appropriate '[w]hen the record contains no proof beyond speculation to support [a] verdict.'"  *Id.* (quoting *Sip-Top, Inc. v. Ecko Group, Inc.*, 86 F.3d 827, 830 (8th Cir. 1996)).

Under Nebraska law, the meaning of a contract and whether a contract is ambiguous are questions of law. *Kluver v. Deaver*, 714 N.W.2d 1, 5 (Neb. 2006).  A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms.  *Lexington Ins. Co. v. Entrex Commc'n Servs.*, 749 N.W.2d 124, 132 (2008).  A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.  *Id.*  A court must construe the contract as a whole and, if possible, give effect to every part of the contract.  *Id.*  A determination as to whether ambiguity exists in a contract is to be made on an objective basis.  *Ruble v. Reich*, 611 N.W.2d 844, 850 (Neb. 2000).  If a contract is ambiguous, the meaning of the contract is

a question of fact, and a court may consider extrinsic evidence to determine its meaning. *Id. Eagle Run Square II v. Lamar's Donuts Int'l*, 740 N.W.2d 43 (2007). A condition is an event, not certain to occur, which must occur, unless its nonconcurrence is excused, before performance under a contract becomes due. *Harmon Cable Communications of Nebraska Ltd. P'ship v. Scope Cable Television, Inc.*, 468 N.W.2d 350, 358 (Neb. 1991) (explaining the difference between a condition and a promise).

The elements of a claim for fraudulent misrepresentation under Nebraska law are: (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that the representation was made with the intention that the plaintiff should rely on it; (5) that the plaintiff did so rely on it; and (6) that the plaintiff suffered damage as a result. *Brummels v. Tomasek*, 731 N.W.2d 585, 591 (Neb. 2007). To constitute fraud, a misrepresentation must be an assertion of fact, not merely an expression of opinion. *Ed Miller & Sons, Inc. v. Earl*, 502 N.W.2d 444, 452 (Neb. 1993) (involving a seller's statement of product's "first-class condition"). Hence, fraud cannot be predicated on mere "sales talk" or "puffing." *Id.* A fraudulent misrepresentation claim requires proof that the defendant knew the statement was untrue or was reckless as to whether the statements were true or false. *Flamme v. Wolf Ins. Agency*, 476 N.W.2d at 809 (Neb. 1991) (Shanahan, J., concurring). In fraudulent misrepresentation, one is liable for breaching the general duty of good faith or honesty. *Id.*

The elements of fraudulent concealment are:  a plaintiff must show that (1) the defendant had a duty to disclose a material fact; (2) the defendant, with knowledge of the material fact, concealed the fact; (3) the material fact was not within the plaintiff's

reasonably diligent attention, observation, and judgment; (4) the defendant concealed the fact with the intention that the plaintiff act in response to the concealment or suppression; (5) the plaintiff, reasonably relying on the fact or facts as the plaintiff believed them to be as the result of the concealment, acted or withheld action; and (6) the plaintiff was damaged in response to the concealment. *Streeks, Inc. v. Diamond Hill Farms, Inc.*, 605 N.W.2d 110, 117 (Neb. 2000). Whether a legal duty to disclose exists is a question of law dependent on the facts in a particular situation. *Id.* at 120 (noting that the existence of a duty to disclose is a question of law, but the breach of that duty is a question of fact for the jury). In nondisclosure cases, whether a duty to speak exists is determined by all the circumstances of the case. *Id.* at 118.

In a vendor/purchaser situation, the contractual relationship creates the duty to disclose. *Id.* at 117. A party to a business transaction has a duty to disclose facts basic to the transaction when the other party would reasonably expect a disclosure. *Id.* at 121. It is consistently recognized that one party to a business transaction is under a duty to exercise reasonable care to disclose facts basic to the transaction, if: 1) he knows that the other is about to enter into the transaction under a mistake as to those facts; and 2) he knows that the other party, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts. *Id.* at 120.

## 2.  Equitable Claims

Unjust enrichment, part of the law of restitution, is used to create an implied or quasi-contractual relationship in the absence of an express contract between parties and has been defined as the unjust retention of a benefit to the loss of another, or the retention

of money or property of another against the fundamental principles of justice or equity and good conscience. *Kisicki v. Mid-America Fin. Inv. Corp.*, 2002 WL 31654490, *6 (Neb. Ct. App. 2002). Unjust enrichment describes a recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels the performance of a legal and moral duty to pay. *Id.* The doctrine of unjust enrichment is recognized only in the absence of an agreement between the parties. *See Washa v. Miller*, 546 N.W.2d 813 (Neb. 1996). "The doctrine does not operate to rescue a party from the consequences of a bad bargain." *Id.* at 819. The enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract. *Id.* An express and an implied contract for the same thing cannot exist at the same time. *Wrede v. Exch. Bank of Gibbon*, 247 Neb. 907, 531 N.W.2d 523 (1995).

A party seeking rescission of a contract on the grounds of fraud, misrepresentation, or business coercion must do so promptly upon the discovery of the facts giving rise to the right to rescind. *Bauermeister v. McReynolds*, 571 N.W.2d 79, 89 (Neb. 1997). The purpose of rescission is to place the parties in a status quo, that is, return the parties to their position which existed before the rescinded contract. *Id.* at 88.

### B.   Analysis

#### 1.   Disputed Contract Provisions

With respect to the meaning and interpretation of the Contract, the court generally finds that the Contract is not ambiguous. The court first finds that the "no reliance" clause of the Asset Purchase Agreement is not ambiguous and is enforceable. By its terms, it limits the Seller's warranties to those found in section 5b of the Contract. The express

warranties in the Contract, together with the duty of good faith and fair dealing, define the Seller's obligations.

The court finds that the adequacy of inventory warranty is part of a larger agreement that transferred ownership of the business to the defendant. When read in the context of the Contract as a whole, giving effect to all of the provisions of the Contract, it is clear that the Seller represented only that the inventories were adequate for the present needs of the business.[6]

The parties' dispute with respect to the "conformity with law" provision centers around whether the Contract's exclusion of occupational health and safety laws from the warranty of "conformity to law" applies to the fire regulations and to the Department of Transportation ("DOT") regulation governing "under-ride protection," meaning that there were no warranties as to the fire and DOT regulations. The court finds as a matter of law that the provision is not ambiguous and that the warranty of conformity to law clearly includes compliance with federal under-ride protection laws. The language of the Contract shows that the Seller represented that the business complied with all laws that apply to the business and its assets. DOT regulations apply to the trailers, which are part of the assets. Those regulations are not the sort of occupational health and safety laws that are excluded under the warranty. Because there were factual issues with respect to the trailer's

---

[6]The court finds that § 5.13 must be read in conjunction with § 5.20 which provides that "the Acquired Assets, when utilized with a labor force substantially similar to that currently employed by the Sellers at the Real Property are adequate and sufficient to conduct the Business as currently conducted by the Sellers" and with § 5.9 which provides that the acquired assets "are in good condition and repair (reasonable wear and tear excepted) and are adequate and sufficient to carry on the business as presently conducted." When read together with the rest of the Contract, the language in Section 5.13 is not susceptible to two meanings. Further, in § 5.20, the Seller represents that the acquired assets, when utilized with a labor force substantially similar to the Seller's labor force, would be adequate to conduct the business as it had been conducted by the Seller at the time. Section 9.4 provides that the Buyer will offer employment to all individuals (other than Golden) employed by the business on the closing date. Section 5.9 also refers to the business "as presently conducted."

compliance with the regulations and the need to remedy the problem, those issues were submitted to the jury.

The court rejects the Buyer's argument that the exclusion is limited to Federal Occupational Safety and Health Act ("OSHA") regulations and finds that any occupational safety regulation is excluded from the warranty provision.  Whether fire regulations are occupational health or safety regulations need not be determined because the evidence shows that the fact that the fire suppression system was not operational was expressly disclosed to the Buyer in schedule 5.8 of the Contract and was thus explicitly excluded from the warranty.

The escrow agreement specifies that $600,000 was set aside to cover claims under section 10.1.  That section provides for indemnification for "claims, liabilities, losses, damages, costs and expenses," for (1) a breach of that Seller's warranties "made in or pursuant to [the contract];" and (2) third-party hazardous substances claims, product liability personal injury claims and employment claims.  The Seller did not indemnify the Buyer for product warranty claims.

## 2.  Seller's Claims

The court finds that escrow agreement provided that the Buyer was entitled to funds in escrow if it submitted a claim to the Seller for a breach of the Asset Purchase Agreement's express warranties or (b) for claims by third parties for personal injury, toxic waste, or employment issues.  The court finds that the Seller has shown that it fulfilled its obligations under the agreement.  The evidence shows that the Buyer breached the agreement by preventing the disbursement of the escrow funds to the Seller.  As discussed below, the Buyer has not shown that the Seller breached any warranties contained in the

29

Asset Purchase Agreement or that it had any third-party claims.  The indemnification provisions of the Contract apply only to warranty claims by third parties, and were not intended to indemnify the Buyer.  The evidence shows that a clause providing broader indemnification was rejected during the negotiation of the Contract.  The Buyer, therefore, had no reason to seek indemnification from the Seller, and wrongfully interfered with the escrow funds.  The Seller has proven damages in that it lost the use of the funds in escrow.  Accordingly, the Seller is entitled to prevail on this claim.

The court finds, however, that the Seller is not entitled to recover on its claims involving the Tridump'r.  The obligations on the part of both the Buyer and Seller in the Transaction Services Agreement are vague and ill-defined.  The Transition Services Agreement required Golden to give them 500 hours and to "use best efforts in a commercially reasonable manner to work toward completing design and prototyping of Tridump'r," etc.  There is apparently no dispute that the Buyer did not furnish Golden space to work on the product.  Golden testified that he fulfilled his obligations to the extent the Buyer allowed, but there has been no showing that the Tridump'r could have or would have been developed and marketed even if the Buyer had fully performed under the agreement and Golden's "best efforts" were used.  The Transition Services Agreement did not impose an obligation on the Buyer to develop the product, it was only obliged to pay Golden for Tridump'rs sold.  None were sold, so the Buyer had no obligation to pay under the agreement.  At best, both sides breached the Transition Services Agreement and neither should recover.

The Asset Purchase Agreement required the Buyer to furnish two Sidump'rs to the Seller and it has not done so.  The Buyer has not shown that its performance of this

component of the Contract was excused.  Accordingly, the court finds that the Seller can recover the reasonable value of the Sidump'rs.

### 3.  Buyer's Claims

#### a.  Breach of Warranty

Because the parties are sophisticated businessmen who were represented by competent and experienced counsel throughout the transaction, the "no reliance" clause is enforceable with respect to the Buyer's breach of warranty claims.  Accordingly, the court finds that it was not reasonable for the Buyer to rely on any oral or written representations outside of the Contract.  The evidence adduced at trial showed that the transactions at issue were arms-length transactions between knowledgeable businessmen who were adequately represented by counsel.  The Contract underwent several revisions and the terms of the Contract were the subject of extended negotiations between the parties.  The evidence shows the warranty provisions and the "no reliance provision" were negotiated terms.  With respect to purported "design flaws," the seller did not warrant that the design of the dump-truck was free of defects, only that the patent for the product was valid.

Viewing the evidence favorably to the Buyer, the court finds that the only evidence of a breach of the warranty of "conformity to law" was the alleged failure to comply with DOT regulations.  With the exception of that claim, no reasonable juror could find that the Seller breach any warranties in connection with the "conformity to law" provision.

The evidence adduced at trial shows that the inventory was adequate to conduct the business in the same manner that it had been conducted prior to the sale.  The evidence shows that the business was able to meet expectations in 2006.  There was no evidence that the Seller was aware, prior to the closing, that the Buyer would eventually encounter

difficulties in obtaining valve parts.  The negotiation and acceptance of the true-up bars any other inventory-related claims.

Further, the evidence shows that the Buyer was allowed access to the Seller's books, his accountant and his bookkeeper.  The Buyer's accountant testified that he reviewed all the accounting records he felt pertinent.  The Buyer acknowledged accounting deficiencies by agreeing to the modified GAAP standard.  The Buyer was on notice that the Seller's bookkeeping was unconventional and that its accounting did not comply with GAAP.  In the face of that knowledge, and with the knowledge that financing had been declined because of accounting deficiencies, the Buyer did not have an independent review or audit of the financials performed.  The court finds that even if the Buyer had shown that the Seller breached any warranty in connection with its financial statements, it would not have been reasonable for the Buyer to rely on those warranties under these circumstances.

### b.  Misrepresentation

Similarly, other than the claim that the Seller misrepresented that there had been no material adverse changes in the company's liabilities, no reasonable juror could conclude that the Buyer proved the elements of its fraudulent misrepresentation claims. First, the Buyer has not shown that the Seller's statements with respect to dump speed and angle were false, and, if false, that the Seller knew they were false when made.  The Seller's statements regarding the superiority of its product were in the nature of sales talk or puffing.  A reasonable and sophisticated businessman would regard such statements as expressions of opinion, not fact.  In the context of a multimillion dollar transaction for the purchase of a business, it is not reasonable to rely on such statements without some

inquiry into their veracity.  Buyers can assume that sellers inflate the virtues of the products they sell.  The due diligence process is designed to respond to that situation.

Although the evidence shows that the issue of warranty expense was not exempted from the parties' agreed-upon modified GAAP, the Buyer knew or should have known that the warranty expenses were under-reported.  In fact, the parties negotiated a warranty reserve and included it in the purchase price. The evidence demonstrates that the Buyer was satisfied with the warranty risk without an audit of the Seller's direct and indirect warranty expenses.  In the context of a transaction of this magnitude, it was not reasonable for the Buyer to rely solely on the Seller's representations.  The Seller's most valuable asset, accounting for fully three quarters of the value of the Seller's business, was the patent.  Again, it was not reasonable for the Buyer to rely on the Seller's representations without any engineering input.  The Buyer did not pursue the opportunity to contact the Seller's engineer as part of its due diligence.  The Buyer's claim for securities fraud fails as a matter of law for the same reasons.

### c.  Fraudulent Concealment

Other than the claim that was submitted to the jury, the evidence shows as a matter of law that the Buyer has failed to prove that the Seller knew of and concealed material facts.  The evidence shows that the material facts at issue were within the Buyer's reasonably diligent attention observation and judgment.  The Buyer had access to the books and knew the books did not comply with GAAP.  The Buyer was on notice that there were deficiencies in the Seller's method of accounting and chose to proceed with the transaction without any independent accounting or engineering review.  There was evidence in the Seller's records that would have caused a reasonable Buyer to question

the Seller's historical warranty expenses.  Moreover, the Buyer did not show that the Seller knew of the magnitude of the pivot-pipe problem prior to the closing.  Indeed, the Buyer conceded that its management did not realize the extent of the problem or that it involved a design flaw until long after the closing, and after the receipt of many more complaints.

### 4.  Equitable Claims

The court finds neither party is entitled to recover on its equitable claims.  There is no evidence that the Buyer is entitled to the defense of unclean hands.  As noted above, this was an arms-length transaction between sophisticated businessmen and the court finds both parties received the benefit of their bargain.  The evidence does not support any finding of unjust enrichment.  That remedy is available only in the absence of a contract and is not designed to rescue a party from the consequences of a bad bargain.  Also, there has been no showing that it is in any way unconscionable or inequitable to allow both parties to retain the respective benefits of the bargain.

The remedy of rescission is similarly unavailable because the Buyer has not tendered ownership of the company to the Seller, so as to place the parties in the position they were in prior to the execution of the purportedly rescinded contract.  In any event, the evidence does not show any ground for rescission.  There was no prior material breach or failure of consideration.  All conditions precedent to the execution of the contract were extinguished at closing.  Similarly, there is no reason to invoke the theories of laches or estoppel with respect to the contract issues.  The court further finds that the Buyer is estopped from asserting any claim for breach of fiduciary duty by Randy Golden in connection with the employee salary dispute by its own breach of fiduciary duties to Golden as a director by excluding him from meetings of the managing directors.  Accordingly,

IT IS ORDERED:

1.  Sidump'r Trailer Co., Inc.'s motion for judgment as a matter of law is granted in part; RSG, Inc.'s, R GROUP, Inc.'s, and Randall S. Golden's claims for breach of contract in failing to develop the Tridump'r, failing to provide a Tridump'r and failing to provide work space are dismissed.

2.  RSG, Inc.'s, R GROUP, Inc.'s, and Randall S. Golden's motion for judgment as a matter of law is granted with respect to its claim for failure to deliver two Sidump'r Trailers and its claim for a declaration that they are entitled to payment of $600,000, plus interest, under the Escrow Fund, and denied in all other respects.

3.  Sidump'r Trailer Co., Inc.'s counterclaims for securities fraud, breach of warranty, fraudulent misrepresentation, and fraudulent concealment are dismissed.

4.  The parties' equitable claims are dismissed.

5.  The court accepts the jury's verdict on the submitted issues.

6.  A judgment in conformity with this opinion will issue this date.

DATED this 10th day of January, 2011.

                              BY THE COURT:


                              s/ Joseph F. Bataillon
                              Chief District Court Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.