**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| RSG, INC., R GROUP, INC., and RANDALL S. GOLDEN, | Case No. 8:06-cv-00507-JFB-FG3 |
| Plaintiffs/Creditors, | |
| v. | |
| SIDUMP'R TRAILER COMPANY, INC., a Delaware corporation, | |
| Defendant/Debtor. | |

**GEMINI INVESTORS III, L.P. & GEMINI INVESTORS IV, L.P.'S
BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

GEMINI INVESTORS III, L.P. and
GEMINI INVESTORS IV, L.P.,

By: /s/ *Nora M. Kane*
    Mark J. Peterson, #18850
    Nora M. Kane, #21562
    STINSON MORRISON HECKER LLP
    1299 Farnam Street, 15th Floor
    Omaha, Nebraska 68102-1818
    Phone:  (402) 342-1700
    Fax:      (402) 930-1701
    mpeterson@stinson.com
    nkane@stinson.com

ATTORNEYS FOR
GEMINI INVESTORS III, L.P. and
GEMINI INVESTORS IV, L.P.

May 9, 2012

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION.............................................................................................. 1

RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL
FACTS ............................................................................................................ 1

GEMINI'S STATEMENT OF UNDISPUTED MATERIAL FACTS.................................. 31

STANDARD OF REVIEW ................................................................................... 33

ARGUMENT.................................................................................................... 34

I.    RSG Failed to Meet Its Burden to Prove a Fraudulent Conveyance Or
      a Basis to Pierce STC's Corporate Veil.................................................. 34

      A.    Fraudulent Conveyance ................................................................ 34

            1.    Interest payments to Gemini.................................................. 35

      B.    Pierce Corporate Veil .................................................................. 37

            1.    Remedy not a Cause of Action ............................................... 37

            2.    Standard for Piercing the Corporate Veil................................... 38

                  a.    RSG has not proven grossly inadequate
                        capitalization.................................................................... 39

                  b.    RSG has not established insolvency of STC at the
                        time a debt was incurred. ................................................... 41

                  c.    RSG has not proven any shareholder diverted STC
                        corporate funds or assets to their own or other
                        improper uses. ................................................................. 42

                  d.    RSG has not proven that STC was a mere façade for
                        the personal dealings of Gemini and that the
                        operations of STC were carried on by Gemini in
                        disregard of the corporate entity. ...................................... 43

CONCLUSION ................................................................................................ 44

# TABLE OF AUTHORITIES

**Cases**

*Christian v. Smith*, 759 N.W.2d 447 (Neb. 2008)........................................................ 38, 39, 40, 44

*Gifford-Hill & Co. v. Stoller*, 380 N.W.2d 625 (Neb. 1986) ........................................................ 34

*Global Credit Svcs., Inc. v. AMISUB*, 508 N.W.2d 836 (Neb. 1993) ............................... 40, 41, 43

*Gross v. Burggraf Constr. Co.*, 53 F.3d 1531 (10th Cir. 1995)..................................................... 36

*J.L. Brock Builders, Inc. v. Dahlbeck*, 391 N.W.2d 110 (Neb. 1986) ......................................... 37

*Kenney v. Swift Transportation, Inc.*, 347 F.3d 1041 (8th Cir. 2003) ......................................... 33

*Southern Lumber & Coal Co. v. M.P. Olson Real Estate & Construction Co. Inc.*, 426
    N.W.2d 504 (Neb. 1988)........................................................................................................ 34

*United States v. Dunkel*, 927 F.2d 955 (7th Cir. 1991)................................................................. 36

**Other Authorities**

36 *Causes of Action 2d* 441 (2008)............................................................................................... 38

**Rules**

Federal Rule of Civil Procedure 54 ........................................................................................ 30, 38

Federal Rule of Civil Procedure 56 ............................................................................................. 33

Federal Rule of Civil Procedure 59 ............................................................................................. 30

Nebraska Civil Rule 54.1 ............................................................................................................. 30

Nebraska Civil Rule 54.3 ............................................................................................................. 30

Nebraska Civil Rule 56.1 ...................................................................................................... 1, 2, 36

**Treatises**

1 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 25............... 39

1 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 26............... 39

1 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.28.......... 38

11 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 5124
    (rev. perm. ed. 1986)........................................................................................................... 41

## INTRODUCTION

RSG, Inc., R Group, Inc., and Randall S. Golden (collectively, "RSG") sold a business for over $12,000,000 to Sidump'r Trailer Company, Inc. ("STC"). RSG then sought and received a judgment against STC for $704,500. RSG did not timely seek taxation of costs or an award of attorneys' fees in the STC litigation. RSG recovered $600,000 from an escrow account, leaving an unpaid balance on the judgment in the amount of $104,500.

STC was put into receivership, and its assets were marshaled and sold. RSG did not seek relief in the Receivership, but instead unsuccessfully challenged its jurisdiction. RSG did not appeal that adverse ruling.

Instead, RSG is pursuing Gemini, claiming that it should not only satisfy STC's unpaid judgment, but also that it should be held responsible for relief not sought in the underlying litigation. Specifically, RSG is attempting to collect $50,000 allegedly owed to Randall Golden by STC, a claim for relief and damages which should have been, but was not, sought in the STC Litigation, and is thus unavailable in this matter. RSG is also attempting to recoup its attorneys' fees and certain costs incurred in the STC Litigation, yet RSG failed to timely file a motion for fees or a bill of costs in that matter and such relief is therefore also barred. In doing so, RSG has buried the Court and counsel in a veritable landslide of paper, claiming to support its allegations by reference to hundreds and hundreds of pages of exhibits. It is obvious that RSG is throwing as much at the wall as it can, hoping something will stick. The reality is that there is no support for its allegations of fraudulent conveyance / preference and no basis to pierce the corporate veil. The Motion is meritless and should be denied in its entirety.

## RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Gemini lodges a general objection to all of RSG's "Statement of Undisputed Material Facts." Local Rule 56.1(a)(2) provides:

> **Form; Citation to Record.** The statement of facts should consist of <u>short</u> numbered paragraphs, each containing pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials that support the material facts stated in the paragraph.  A fact is "material" if pertinent to the outcome of the issues identified in the summary judgment motion.  The statement of facts must describe the parties and recite all facts supporting the court's venue and jurisdiction.  The statement must not contain legal conclusions.  <u>Failure to provide citations to the exact locations in the record supporting the factual allegations may be grounds to deny the motion.</u>

NECivR 56.1(a)(2) (emphasis in original).  Most of RSG's asserted material facts contain multiple assertions, and often no pinpoint citations.  Moreover, many of the statements of fact are not material as defined by NECivR 56.1(a)(2).  Finally, many of the statements contain impermissible legal conclusions.  In order to save space in this brief, when the aforementioned objections are invoked, they will be referred to as Gemini's "General Objection."

1.      Randy is and at all times during the pendency of the above proceedings has been a citizen of the State of South Dakota.  ¶2, Golden Declaration.  RSG was formed on December 13, 2004 under the law of South Dakota.  *Id.*  At all times after its incorporation to the present, Randy has owned 51% of the issued and outstanding capital stock of RSG and Carolyn Golden, Randy's spouse, has owned the balance of the issued and outstanding capital stock of RSG.  *Id.*  RSG's principal place of business is and during the pendency of the above captioned proceedings has been located in South Dakota.  *Id.*  R Group, Inc., a South Dakota corporation, is the surviving corporation of a merger between to R Group, Inc., an Iowa corporation, and R Group, Inc., a South Dakota corporation.  *Id.*  The merger occurred effective March 1, 2006.  *Id.*  R Group, Inc., an Iowa corporation, was a wholly owned subsidiary of RSG from at least September 1, 2005 up to the date of the merger.  *Id.*  After the March 1, 2006 merger and up to the present, R Group, Inc., a South Dakota corporation, has remained the wholly owned subsidiary of RSG.  *Id.*  After the March 1, 2006 merger, the principal place of business of R

Group, Inc., a South Dakota corporation, has been continuously located in the State of South Dakota. *Id.*

**ANSWER TO NO. 1.** Admitted.

2.      Prior to January 10, 2006, R Group, Inc., an Iowa corporation, operated a business known as Sidump'r Trailer Company which manufactured and sold a unique trailer that dumped sideways (the "Business").  ¶3, Golden Declaration.  R Group, Inc., an Iowa corporation, owned all of the assets of the Business, other than the real estate comprising the manufacturing plant in Plainview, Nebraska, which RSG owned, and the intellectual property relating to the Sidump'r trailer, including the patent for the Sidump'r trailer, which Randy owned. *Id.*

**ANSWER TO NO. 2.** Admitted.

3.      Sidump'r Holdings, Inc. ("Holdings"), was formed under Delaware law to serve as the holding company for the leveraged acquisition of the Business through a newly formed wholly owned subsidiary, also formed under Delaware law, named Sidump'r Trailer Company, Inc. ("STC").  ¶4, Golden Declaration.  The principal place of business of both Holdings and STC has been located in the State of Nebraska at all times during the pendency of the above captioned proceedings. *Id.*

**ANSWER TO NO. 3.** Admitted.

4.      Gemini Investors III, L.P. ("Gemini III"), is a Delaware limited partnership. Amended Complaint, Gemini Filing No. 53.  Gemini Investors IV, L.P. ("Gemini IV"), is a Delaware limited partnership.  Amended Complaint Gemini Filing No. 53.

**ANSWER TO NO. 4.** Admitted.

5.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, as it is a civil matter between citizens of different states, and the amount in controversy,

exclusive of interest and costs, exceeds $75,000.  Amended Complaint, Gemini Filing No. 53. Pre-Trial Order, Filing No. 262.

**ANSWER TO NO. 5.**  Gemini admits that this Court has subject matter jurisdiction over RSG's attempt to impose liability for the unpaid judgment in the underlying cause of action by attempting to pierce the corporate veil.  Gemini disagrees that RSG's attempt to seek any relief beyond the unpaid judgment of $104,500.00 or its attempt to collect attorneys' fees and certain costs incurred in the STC Litigation is properly before this Court.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, as it is a judicial district within which a substantial part of the events or omissions giving rise to the controversy occurred.  Pre-Trial Order, Filing No. 262.

**ANSWER TO NO. 6.**  Gemini agrees that venue is proper in this District.

7.     Holdings had 2 classes of stock: a mandatorily redeemable non-convertible preferred stock, which the accountants treated as debt, and common stock, as evidenced by the Certificate of Incorporation of Holdings, a true and complete copy of which is attached to the Golden Declaration as Exhibit 1.  ¶4, Golden Declaration.  On January 10, 2006, Holdings issued the following number of shares of preferred stock and common stock to the persons indicated for the consideration stated:

### PREFERRED STOCK

| Party | Preferred Shares | Consideration |
|---|---|---|
| Gemini Investors III, L.P. | 11,870.9625 | $  1,187,096.25 |
| Gemini Investors IV, L.P. | 11,870.9625 | $  1,187,096.25 |
| Michael R. Starkle | 199.9320 | $     19,993.20 |
| Arnold L. Greenberg Children's LLC | 124.9575 | $     12,495.75 |
| Kenneth L. Greenberg | 99.9660 | $       9,996.60 |
| William P. Jancosko IRA | 74.9745 | $       7,497.45 |
| Patriot Capital Funding, LLC I | 749.7450 | $     74,974.50 |
| **TOTAL:** | 24,991.5000 | $  2,499,150.00 |

## COMMON SHARES

| Party | Common Shares | Consideration |
|---|---|---|
| Gemini Investors III, L.P. | 40,375 | $ 403.75 |
| Gemini Investors IV, L.P. | 40,375 | $ 403.75 |
| Michael R. Starkle | 680 | $ 6.80 |
| Arnold L. Greenberg Children's LLC | 425 | $ 4.25 |
| Kenneth L. Greenberg | 340 | $ 3.40 |
| William P. Jancosko IRA | 255 | $ 2.55 |
| Patriot Capital Funding, LLC I | 2,550 | $ 25.50 |
| Michael Starkle | 3,300 | $ 33.00 |
| Kenneth L. Greenberg | 2,700 | $ 27.00 |
| William P. Jancosko | 2,000 | $ 20.00 |
| Christopher Rule | 2,000 | $ 20.00 |
| **TOTAL:** | **95,000** | $ 950.00 |

¶4, Golden Declaration.

**ANSWER TO NO. 7.** The preferred stock is treated by accountants as debt, but the preferred shares are a financial instrument that has characteristics of both debt (fixed dividends) and equity (potential appreciation). In the event of bankruptcy or liquidation of the company's assets, there is substantial risk that there will be nothing left after paying senior secured creditors, as happened in this matter, hence, they must be included in the inquiry regarding adequate capitalization. (Ex. 5, Millet Decl. at ¶4). The common shares section is accurate but for the failure to include Randy Golden's stock. Last two lines should appear as follows:

| | | |
|---|---|---|
| Randy Golden | 5,000 | $ 50.00 |
| **TOTAL:** | **100,000** | $ 1,000.00 |

8. On January 10, 2006, Randy acquired 5,000 shares of common stock of Holdings in connection with the sale of the Business to STC. ¶4, Golden Declaration. This brought the total outstanding shares of Holdings common stock to 100,000 shares issued at a price of $.01 per share, for a total consideration of $1,000. *Id.* The two investment funds named Gemini Investors III, L.P., and Gemini Investors IV, L.P. ("collectively Gemini"), were managed by Gemini Investors. *Id.* Patriot Capital Funding, Inc. ("Patriot") was STC's lender. *Id.* Gemini

owned approximately 80.75% of the outstanding common stock of Holdings, until approximately September of 2008 at which time their percentage decreased to a lesser controlling percentage. *Id.*

**ANSWER TO NO. 8.** Gemini admits the allegation in No. 8, subject to the General Objection, *supra*.

9.      The total stockholder's equity of STC, determined in accordance with generally accepted accounting principles on a consolidated basis, after accounting for all capitalization transactions occurring on January 10, 2006, was the grossly inadequate sum of $1,000, as evidenced by the STC audited financial statements for the period ending December 31, 2006. Exhibit 2 attached to the Golden Declaration.; ¶4, Golden Declaration.

**ANSWER TO NO. 9.** Denied. Gemini denies the accuracy of No. 9. RSG purports to rely upon Exhibit 2 attached to the Golden Declaration, which is an incomplete copy of the STC audited financial statements for the period ending December 31, 2006, wherein RSG has omitted the page delineating STC's assets.[1] A review of the complete document demonstrates that RSG's argument is completely unfounded. (Ex. 1, STC's Audited 2006 Financial Statements). There was $549,355 of cash on the balance sheet on December 31, 2006. *Id.* The current ratio[2] was 1.16, which represents a clean bill of health for STC, as it means for every dollar of current liabilities, there was $1.16 of current assets. There was an additional $320,000 available to the company from its senior lender. *Id.* The income from operations for calendar year 2006 from these same audited statements was $1,595,082, and the company paid down its bank debt by $865,875. *Id.* STC had an inventory of at least 100 trailers to be sold at net $12,000 to $15,000,

---

[1] RSG filed a partial copy of this document at ECF 358-2, missing page 6 of 22, which is the page setting forth STC's assets.

[2] The current ratio is a common diagnostic of business liquidity (current assets/current liabilities).

for additional liquidity of at least $1.2M to $1.5M.  (Ex. 2, Excerpt of Sharp Dep. Tr. at 61:12-18).  Finally, RSG omits the preferred stock ($2,499,150.00); *see* Answer to No. 7, *supra*.

10.     On January 10, 2006, Holdings acquired all of the issued and outstanding shares of common stock of the newly formed STC, which then became a wholly owned subsidiary of Holdings.  ¶5, Golden Declaration.  Holdings formed STC for the purpose of acquiring the real, personal, and intellectual property of Golden comprising the Business in a leveraged transaction. Holdings had no other business than owning STC.  *Id.*  Randy served as a director of STC from January 10, 2006 up to November 19, 2008.  *Id.*

**ANSWER TO NO. 10.**  Gemini admits the assertions in No. 10, subject to its General Objection, *supra*.

11.     On January 10, 2006, Sidump'r and Golden entered into and closed a certain Asset Purchase Agreement pursuant to which Sidump'r purchased the Business for a cash purchase price of $12,743,977.16, subject to adjustment for net working capital as of December 31, 2005 in excess of $800,000 (increasing the purchase price) or less than $800,000 (decreasing the purchase price).  ¶6, Golden Declaration.  The APA provided that the final determination of the net working capital adjustment would be determined sixty days after Closing.  *Id.*  At the closing of the Asset Purchase Agreement, Randy entered into the TSA with STC.  Exhibit 3, attached to Golden Declaration.

**ANSWER TO NO. 11.**  Admitted.

12.     In March 2006, Gemini engaged Michael Sharp ("Sharp") to advise them with respect to their investments in Holdings.  ¶7, Golden Declaration.  72:8-12 and 118:17-25, McKinley Deposition; 53:14-53:24, Millet Deposition (*saying*: "Q We know ultimately that she, in fact, did *on behalf of Gemini* engage Mr. Sharpe, did she not? A She did. [italics supplied for

emphasis]").  Simmons characterized Sharp as Gemini's "quarterback" on the scene.  Exhibit 28 to the Golden Declaration (email dated March 28, 2006 from Molly Simmons to David Millet *saying*: "Sharpie is our day to day quarterback and is really managing Bill [Jancosko], but we need to probably help out there.").  On June 8, 2007, Sharp represented to various creditors of STC that he was an authorized representative of Gemini.  Exhibit 28 (email dated June 8, 2007 from Michael Sharp to Kurt Dannehl and Brandon Luke, copy to Bob McKinley, Molly Simmons, David Millet, and Michael Monroe, *saying*: "*On behalf of Gemini Investors* (equity sponsor of Sidump'r) we are extremely appreciative and thankful for your extraordinary support, diligence, expertise and 'get 'er done' efforts here.  Your endeavors have not gone unnoticed and we will explore ways with our relevant companies in the portfolio to work with Fasse, if possible. [italics supplied for emphasis").  In March, 2006, Simmons "positioned" Sharp to STC personnel as a friend of Gemini that had helped Gemini with other Gemini companies.  Depo. Exhibit 473, Simmons Deposition (email dated March 9, 2006 from Molly Simmons to msgroup@adelphia.net [Michael Sharp] *saying*: "You have been positioned as a friend of Gemini's who has provided additional resources on other companies in the portfolio, as needed.").  Sharp had no written agreement evidencing his engagement.  54:17-56:6, Sharp Deposition.

**ANSWER TO NO. 12.**  Gemini objects on the basis of the General Objection, *supra*.  Michael Sharp was engaged by and reported to STC's Board of Directors.  (Ex. 3, Sharp Decl. at ¶5).  Mr. Sharp was unpaid by STC for part of his services and never sought payment from Gemini.  (Ex. 5, Millet Decl. at ¶7).  Mr. Sharp also provided personnel and other corporate reports and updates to Gemini as the equity owner of STC, which reporting is done in the

ordinary course of Mr. Sharp's consulting business, Delray Partners, LLC.  (Ex. 4, Sharp Bio, http://delraypartners.com/).

13.    From March, 2006 up to the appointment of a receiver for STC on or about November 20, 2008, Molly Simmons ("Simmons"), a managing director of Gemini Investors and a representative of Gemini, David Millet ("Millet"), another managing director of Gemini Investors and a representative of Gemini, and Sharp controlled every material facet of the operations of Holdings and STC.  Depo. Exhibits 573, 584, 591, 595, 598, 599, 600, and 603, attached to Simmons Deposition; ¶¶7 and 14, Golden Declaration; ¶6, Thompson Declaration (*saying*: "From March, 2006 up to the termination of Declarant's employment on May 17, 2007, David Millet ("Millet"), a Managing director of Gemini Investors and a representative of Gemini, Michael Monroe ("Monroe"), a representative of Gemini, Simmons, another representative of Gemini, and Sharp singularly and collectively made decisions in regards to the operations of STC, including pricing decisions, borrowing, product development, personnel relations, employee compensation, capital expenditures, payment of creditors, selection of vendors, selection of attorneys, financial reporting, and relations with Patriot Capital."); Exhibits 6, 7, 9, 13(i), 13(ii), 20, 21, 22(i), 22(ii), 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, and 39 to the Golden Declaration.  Depo. Exhibits 301, 303, 304, 308, 313, and 315 attached to Monroe Deposition; 149:10-12, Monroe Deposition (*saying*: "Gemini -- representatives from Gemini were much more involved than we had planned to be, than would typically be the case in one of our investments."); Depo. Exhibits 573, 584, 591, 595, 598, 599, 600, and 603, attached to Simmons Deposition.

**ANSWER TO NO. 13.** Gemini objects on the basis of the General Objection, *supra*. The depositions supporting the allegations in No. 13 are not properly authenticated.  Reference is

made to nearly 40 exhibits, consisting of over 900 pages.  The allegations are denied as there is no evidence supporting them.  It is immaterial that Messrs. Millet and Monroe, and Ms. Simmons were all on STC's Board of Directors, or that the Board played an active role on all the items discussed in No. 13, and these allegations are therefore not material.  Further, No. 13 ignores the fact that other STC Board members included Mike Starkle, Ken Greenberg, and Bill Jancosko, all of Timepiece Capital, another investor.  It also ignores non-Gemini leadership in STC, including Jennifer Thompson's participation in the operation of STC as well as that of later-appointed CEO Robert McKinley, and consultant Michael Sharp.

14.     Gemini personnel reviewed monthly financial reports before they were submitted to Patriot Capital.  Exhibits 23 and 31 to Golden Deposition.  Depo. Exhibit 374, attached to McKinley Deposition.  Indeed, Simmons undertook the role of providing STC's monthly reports to Patriot Capital for many months.  Depo. Exhibit 255, attached to Monroe Deposition.

**ANSWER TO NO. 14.**  Gemini admits that Molly Simmons, as an STC Board member, undertook the role of providing STC's monthly reports to Patriot Capital and, further, that other members of STC's Board of Directors, who were not affiliated with Gemini, reviewed monthly financial reports.  There is nothing improper about a Board of Directors doing such, and the allegations in No. 14 are simply immaterial.

15.     From March, 2006 up to the appointment of a receiver for STC on or about November 20, 2008, STC acted as the mere instrumentality and alter ego of Holdings, which in turn acted as the mere instrumentality and alter ego of Gemini, with respect to STC's operation of the Business.  See exhibits, declarations, deposition testimony, and deposition exhibits cited in No. 13 above.

**ANSWER TO NO. 15.** Gemini objects to the allegations in No. 15 subject to the General Objection, *supra*. No. 15 ignores the fact that other STC Board members included Mike Starkle, Ken Greenberg, and Bill Jancosko, all of Timepiece Capital, another investor. It also ignores non-Gemini leadership in STC, including Jennifer Thompson's participation in the operation of STC as well as that of later-appointed CEO Robert McKinley, and consultant Michael Sharp, No. 15 constitutes nothing more than a legal conclusion, and asks the Court and counsel to again review the 900-plus pages cited in No. 13 above.

16.     On or about June 19, 2006, Randy participated in a telephonic meeting of the STC Board of Directors with Jennifer Thompson, Sharp, Michael Starkle, Simmons, Millet, Michael Monroe, and Kenneth Greenberg, all on one conference telephone call. ¶8, Golden Declaration; ¶7 Thompson Declaration. During the course of this meeting, Sharp said on a number of occasions that various expenses would be a "charge back against the deal." *Id*; 128:15-129:4 and 130:9-18, Thompson Trial Testimony.

**ANSWER TO NO. 16.** Admitted, but the allegations in No. 16 constitute immaterial facts.

17.     Prior to the June 19, 2006 telephonic board meeting, Simmons had revealed to Jennifer Thompson that STC intended to make claim against Randy and stated that this was not to be revealed to Randy. ¶7, Thompson Declaration; 131:7-132:19 and 135:11-25, Thompson Trial Testimony. Simmons stated that she did not want Randy to know of STC's intent to make claim against him because that would interfere with STC's negotiations over the true up adjustment of the purchase price and Randy's continued work on the Tri-Dump'r. 141:5-13 and 143:1-144:12, Thompson Trial Testimony; ¶7, Thompson Declaration. The references to "charge back" during the June, 19, 2006 telephone meeting meant warranty claims that would be

charged against Randy.   130:9-18, Thompson Trial Testimony; ¶7, Thompson Declaration. Immediately after the parties hung up upon the conclusion of the June 19, 2006 Board call, Jennifer Thompson spoke with Simmons, Sharp, and perhaps others, in a subsequent telephone call without Randy on the line.   137:11-139:2, Thompson Trial Testimony; ¶7, Thompson Declaration.   During this later conversation, Simmons chastised Sharp for referring to charge backs against the deal. ¶7, Thompson Declaration. Simmons told Sharp that Randy was not supposed to know of the plan to make claims against him. Simmons said that she would talk to Randy and assure him everything was okay.  *Id.*  During this later call without Randy on the line, Simmons again stated that no one was to tell Randy that STC intended to make claim against him.  *Id.*  Approximately a couple of days later, Simmons told Declarant and Sharp during a telephone call that she had talked to Randy and everything was okay.  *Id.*

**ANSWER TO NO. 17.**  Gemini admits the allegations in No. 17 subject to the General Objection, *supra*.  However, the allegations in No. 17 are immaterial.  It is ludicrous to assert that a party's failure to inform you that you were going to be sued is actionable or relevant in any respect.

18.    On June 21, 2006, two days after the STC Board of Directors call, Simmons and Randy had a phone conversation during which Randy asked Simmons what Sharp's statements during the Board meeting about "charge backs against the deal" meant.  ¶9, Golden Declaration. Simmons responded that the reference was to a technical accounting charge which had nothing to do with Randy.  *Id.*  Simmons told Randy during this conversation that STC had no intent of making a claim against Randy on the deal, other than for the true up adjustment, which was then being negotiated.  *Id.*  Simmons told Randy that the only claim STC had against Golden was the recovery of the true up adjustment, and that STC had no intent of making any other claim against

Golden. *Id.* After this phone conversation with Randy, Simmons told Jennifer Thompson that Simmons had talked to Randy and that Randy was OK. ¶7, Thompson Declaration.

**ANSWER TO NO. 18.** Gemini admits the allegations in No. 18 subject to the General Objection, *supra*. However, the allegations in No. 18 are immaterial. *See* Answer to No. 17, *supra*.

19.    Simmons made the statements to Randy during the June 21, 2006 phone conversation, knowing their falsity, and that such statements would induce Golden to enter into the Agreement for Purchase Price Adjustment, a true and complete duly executed copy of which is attached to the Golden Declaration as Exhibit 4, and to pay STC the true up payment. ¶7, Thompson Declaration; ¶9, Golden Declaration. On or about June 22, 2006, the Golden Parties and STC entered into the Agreement for Purchase Price Adjustment and the Golden Parties paid STC $26,699.56. ¶9, Golden Declaration; Depo. Exhibits 507, 508, 509, 510, 511 attached to Simmons Deposition. At the time the Agreement for Purchase Price Adjustment was executed, Bill Jancosko created work papers setting forth the proper calculation of STC's beginning inventory, as adjusted for the true up correction. A true copy of these work papers is attached as Exhibit 5 to the Golden Declaration and as Depo. Exhibit 507 attached to the Simmons Deposition.

**ANSWER TO NO. 19.** Gemini objects to the allegations in No. 19 on the basis of its General Objection, *supra*. Gemini denies that RSG has alleged any facts or adduced any evidence to support the assertion that any statements made by Ms. Simmons to Randy Golden on June 21, 2006 were related to the Agreement for Purchase Price Adjustment. None of the allegations in No. 19 are material to the Motion at hand.

20.     Simmons's June 21, 2006 statements to Randy were a material inducement to the Golden Parties to settle the purchase price adjustment issue for a payment of $26,699.56 to STC, and to enter into the Agreement for Purchase Price Adjustment (Exhibit 4, attached to Golden Declaration) with STC.   Depo. Exhibits 507, 508, 509, 510, 511 attached to Simmons Deposition. ¶9, Golden Declaration.  At the time Simmons made these statements to Randy on June 21, 2006, Simmons knew that STC actually intended to make claim against the Golden Parties for amounts vastly in excess of the amount of the inventory adjustment STC was then negotiating with the Golden Parties. *Id.*; ¶7, Thompson Declaration.  The Golden Parties had no knowledge of STC's actual intent to make claim against them in excess of the amount that the parties agreed upon for the true up adjustment, and had no reason to believe that Simmons's June 21, 2006 statements were false.  ¶9, Golden Declaration.  On June 22, 2006, the Golden Parties, relying upon Simmons's June 21, 2006 statements, in good faith entered into the Agreement for Purchase Price Adjustment (Exhibit 4), and paid STC the agreed sum of $26,699.56.   *Id.* Simmons made the false statements to Randy on June 21, 2006 in her dual capacities as the acting Chairman of the Board of STC, and as an authorized representative of Gemini, the majority shareholder of STC's parent, Holdings.  *Id.*

**ANSWER TO NO. 20.**  See Answer to No. 19, *supra*.

21.     By letter dated July 7, 2006, Gemini caused STC to notify the Golden Parties of the existence of alleged breaches of warranties made to STC in the APA, resulting in damages totaling in excess of $2 Million dollars.  ¶10, Golden Declaration.  Thereafter, Gemini caused STC to file numerous Counterclaims in the above captioned proceedings, contrary to the statements Simmons made to Randy during the June 21, 2006 phone call.  *Id.*

**ANSWER TO NO. 21.**  Gemini objects to the allegations of No. 21 because they are without adequate foundation.  The allegations are based entirely upon Mr. Golden's Declaration, which, standing alone, does not support the allegations.  Furthermore, STC acted at the behest of its Board of Directors, not Gemini.  *See* Ex. 5, Millet Decl. at ¶6.

22.     By Judgment dated and entered on January 10, 2011, this Court dismissed all of STC's Counterclaims against the Golden Parties with prejudice, entered a declaratory judgment that the Golden Parties are entitled to the $600,000 principal plus interest thereon held under an Escrow Agreement between the Golden Parties and STC entered into at the Closing of the APA, and entered judgment against STC in favor of the Golden Parties in the principal amount of $104,500 as damages for STC's breach of the TSA.  Filing No. 302; ¶11, Golden Declaration.

**ANSWER TO NO. 22.**  Gemini admits that this Court entered its Memorandum and Order and Judgment on January 10, 2011.  (ECFs 301 & 302).  However, No. 22 contains only a portion of the contents of those filings.  Both parties had claims and counterclaims submitted to the jury, however, RSG undeniably prevailed and in addition to the $12M plus it received in payment for STC, it also had judgment entered on its claim for declaration that RSG was entitled to a payment of $600,000 plus interest from the escrow fund, along with a money judgment of $104,500.

23.     The $104,500 judgment against STC remains wholly unsatisfied.  ¶12, Golden Declaration.  STC has no assets available to satisfy the Judgment.  *Id.*; Filing Nos. 322 and 325.  The Golden Parties have determined through post-judgment discovery that STC has no assets in it's [sic] name.  *Id.*  See Filing No. 322, 325.  Instead, Gemini, as the alter ego of STC, appears to hold the vast majority of STC's assets.  ¶12, Golden Declaration.

**ANSWER TO NO. 23.** Gemini agrees that the $104,500 judgment against STC remains unsatisfied and that STC has no assets available to satisfy the judgment. Gemini denies that it "hold[s] the vast majority of STC's assets." *See* ECFs 320 & 321, Gemini Investors III & IVs' Answers to Writ of Garnishment, which provide, under oath, that Gemini has no assets of STC. All of STC's assets were marshaled by the Receiver. (ECF 368-1, Golden Decl. Ex. 38, Judge Kube's Order).

24.     Gemini directed STC personnel not to pay Randy the director fees he was contractually entitled to be paid, as evidenced by the emails attached to the Golden Declaration as Exhibit 6.

**ANSWER TO NO. 24.** Gemini denies the allegations of No. 24. As the emails referred to as Golden Declaration Exhibit 6 demonstrate, STC's Board of Directors made the decision to hold all directors fees, not just Randy Golden's. Furthermore, the directors fees are not properly a part of this action as Randy Golden failed to make a claim for them in the underlying litigation. (ECF 262, Pre-Trial Order at pp. 3-6 of 162).

25.     Gemini directed STC to file and prosecute the Counterclaims against the Golden Parties as evidenced by the emails attached to the Golden Declaration as Exhibit 7. Depo. Exhibit 313, attached to Monroe Deposition. Gemini, by its own admission, controlled the Counterclaims. Exhibit 29, attached to Golden Declaration (email dated July 21, 2008 from Simmons to Millet concerning negotiations with Patriot Capital, Simmons wrote that "Gemini maintains control of lawsuit."); Depo. Exhibit 313 attached to Monroe Deposition.

**ANSWER TO NO. 25.** Gemini denies the allegations of No. 25. All the persons on the emails referenced in No. 25 are on STC's Board of Directors, and not all are related to Gemini. Moreover, the email dated July 21, 2008, does not appear to have been sent, but is an email sent

from Ms. Simmons to herself and thus cannot support the allegations stated therein.  Obviously, STC's Board of Directors was the point-person for the attorneys in the filing and prosecution of the counterclaims against RSG.

26.     Gemini caused STC not to deliver the 2 Trailers to Declarant in accordance with the requirements of the TSA in September, 2006, even though they were then available, as evidenced by the emails attached as Exhibit 8 to the Golden Deposition.  Depo. Exhibit A to Thompson Declaration.

**ANSWER TO NO. 26.** Gemini admits that STC did not deliver the two trailers to Randy Golden, and Gemini further states that Randy Golden has already prevailed on his claim against STC and this allegation is immaterial to the matter at hand.

27.     Gemini tacitly approved Sharp's admonition to Robert McKinley, STC's purported CEO, on March 28, 2008 that he had to be prepared to do the things to financially survive – even if that means going back on his word or losing credibility with certain vendors, as evidenced by the email dated March 28, 2008 attached to the Golden Declaration as Exhibit 9. Depo. Exhibit 585, attached to Simmons Deposition.   359:23-360:2, Simmons Deposition (*saying*: "Did you tell him that it would be inappropriate to have anybody at Sidump'r doing what it took to survive even if it meant going back on their word or losing their credibility with customers? A. I don't believe I said that.").

**ANSWER TO NO. 27.** Gemini denies the allegations set forth in No. 27, as the evidence cited does not support them.  Regardless, the allegations of No. 27 are immaterial to the matter at hand.

28.     Gemini authorized STC to make a bonus payment to Jennifer Thompson which Gemini knew to be based on an EBITDA number that was substantially less than the EBITDA

number STC reported to Patriot Capital and Randy, thereby defrauding either Jennifer Thompson or Patriot Capital and Randy, as evidenced by the emails attached to the Golden Declaration as Exhibit 10.   Depo. Exhibit 379 attached to McKinley Deposition (*saying*: Based on our calculated understatement of monthly COGS in the first half of the year (which will be verified upon completion of August 31 physical), we increased COGS by $180K through June.  This effectively reduced Adjusted EBITDA by the same amount resulting in $1.322m.  We believe this to be the proper and defensible position.").   But, the August 31, 2007 financials that McKinley sent Patriot Capital on October 1, 2007 continue to report the adjusted EBITDA through June 30, 2007 to be $1.5M.  Depo. Exhibit 375 attached to McKinley Deposition; 245:6-246:9, McKinley Deposition.   The year end 2007 unaudited financials indicate that no adjustment for this supposed increase in COGS for the first six months of 2007 was ever made in the financial statements of STC.  Exhibit 11(ii) attached to the Golden Declaration.

**ANSWER TO NO. 28.**  Gemini objects to No. 28 as being immaterial to the matter at hand.   If STC defrauded Randy Golden relating to making a bonus payment to Jennifer Thompson, Mr. Golden should have asserted his claim in the underlying litigation.  Because he did not, the issue is not properly before the Court in a pierce the corporate veil proceeding.

29.   In 2007 and 2008, Gemini caused STC to pay fees charged by Sharp for services related to Sharp's work for Gemini, which were not fairly chargeable to STC, at times STC was insolvent, thereby perpetrating a fraud on STC's creditors.  See Sharp reports to Gemini included in Exhibit 28, attached to the Golden Declaration; 2007 and 2008 financials and excerpts from the 2007 and 2008 Cash Ledgers identified as Exhibits 11(i), 11(ii), 11(iii), 11(iv), 11(v) and 11(vi) attached to the Golden Declaration; 113:15-22, Millet Deposition (*saying*: "Q By the way, did Gemini get billed separately for this sort of information as is provided in Exhibit 570 by Mr.

Sharpe or his partner? A I doubt it. Q You think that Sidump'r was billed for this, 570? A Probably.").  The excerpts from the 2007 and 2008 cash receipts ledgers reveal that STC paid Sharp and his firm, Delray Partners, $339,67.02 in 2007 and $72,765.90 in 2008.  Exhibits 11(v) and 11(vi).  There is a prodigious amount of work product that Sharp did for Gemini's benefit at STC's expense.  See confidential reports for Gemini's eyes only included in Exhibit 28, attached to Golden Declaration.

**ANSWER TO NO. 29.**  Gemini denies that the fees paid to Michael Sharp were related to any work for Gemini.  Clearly, Mr. Sharp's role was to benefit STC, and his reports to Gemini were merely incidental to that role.  *See* Ex. 3, Sharp Decl.  Further, when STC failed to pay Sharp the entirety of his consulting fees, he did not ask Gemini to pay them.  (Ex. 5, Millet Decl. at ¶7).

30.      Gemini caused STC to continue production of trailers with known defects without disclosure to its customers of the extent and nature of such defects and potential safety concerns, as evidenced by the emails attached to the Golden Declaration as Exhibit 12; 82:18-83:18, Millet Deposition; ¶5 Thompson Declaration; Depo. Exhibits 513, 514, and 519, attached to Simmons Deposition; Depo. Exhibit 642, attached to Millet Deposition; Tr. Exhibit 33, attached to the Thompson Trial Testimony.

**ANSWER TO NO. 30.**  Gemini asserts the General Objection, *supra*.  In addition, Gemini denies the allegations set forth in No. 30 as they are not supported by the exhibits purporting to prove the allegations.  The exhibits in fact appear to merely evidence the STC Board of Directors were accumulating information to include in their demand letter and later their counterclaims against RSG.

31.     Gemini directed Robert McKinley, the purported CEO of STC not to communicate with Randy, even though Randy was a member of STC's Board of Directors, as evidenced by the emails attached to the Golden Declaration as Exhibit 13.  Depo. Exhibit 584, attached to Simmons Deposition.

**ANSWER TO NO. 31.**  Gemini admits the assertions set forth in No. 31, but denies their materiality.

32.     Gemini caused meetings of the Board of Directors to be conducted without inviting Randy under the false pretense that such meetings were meetings of an operating committee of the Board, as evidenced by the emails attached to the Golden Declaration as Exhibit 13(ii). Depo. Exhibit Nos. 259, 300, 301, 304, 308, and 315, attached to the Monroe Deposition; 140:10-141:4, Thompson Trial Testimony; 224:7-17, Jancosko Deposition (*saying*: "After the lawsuit started I know they [Gemini] quit having board meetings."); 165:18-166:18, Starkle Deposition (*saying*: "Q. In other words, whoever -- you were not the person responsible for his exclusion? Someone else was? MS. BLACKWELL: Objection; form. A. I think that's a fair statement. Q. Would that be fair? You're going to have to say that's fair or not. A. That's fair.").  Gemini caused STC to provide monthly financial statements to Randy that were less detailed than the financial statements provided to all other STC directors, as evidenced by the emails attached to the Golden Declaration as Exhibit 17.

**ANSWER TO NO. 32.**  Gemini admits that the STC Board of Directors had an operating committee that met without Randy Golden, who was not a member of that committee.  Gemini denies that STC's monthly financial statements which were sent to Randy Golden were less detailed than the financial statements provided to all other STC Directors because there is no support for that allegation in the evidence cited by RSG.

33.     Gemini attempted to tamper with and improperly influence the testimony of Jennifer Thompson in the above proceedings by entering into an agreement to pay her $100.00 per hour for i) her time spent assisting STC in the preparation of its case against the Golden Parties and ii) her time spent testifying for STC against the Golden Parties, as evidenced by the Mutual Separation Agreement and Release attached to the Golden Declaration as Exhibit 14. The Mutual Separation Agreement and Release stated that it was executed and delivered by "Jennifer Thompson personally and on behalf of all her heirs, executors, assigns, devisees, administrators, successors in interest, agents, servants, representatives, employees, shareholders and attorneys (hereinafter collectively "Employee") in favor of SIDUMP'R TRAILER COMPANY, INC. and all of its former, **current**, and future **owners** and employees, and all of their respective predecessors, successors, assigns, affiliates, agents, attorneys, representatives and all related entities (hereinafter collectively "Employer") [Bold added for emphasis]." Gemini was an apparent third party beneficiary of this Mutual Separation Agreement.  This Mutual Separation Agreement and Release provided in pertinent part at paragraph 8:

> . . . Employee promises that, as of the date of the Release, and in consideration for the payment from Employer provided by this Release, she will fully cooperate with the Employer to transition her work to others within the company and to assist Employer with any outstanding matters. This cooperation shall include, but not be limited to, returning all company property, Company confidential information, data, equipment, records and files from any location to the Employer immediately or as pre-arranged with CEO within twenty four hours of executing this Release. **Further cooperation shall include her consultation, participation and sharing of information in any current or future legal action between the En1ployer and its former owner upon the reasonable request of Employer or its counsel. In consideration for En1ployee's services in any or current future legal action between the Employer and its forn1er owner, Employer will pay En1ployee a consulting fee of One Hundred Dollars and No Cents ($100.00) per hour, subject to pre-approval of the CEO or his designee.** [Bold added for emphasis].

When asked why STC agreed to pay Jennifer Thompson so much, Robert McKinley stated:

> I don't know. I don't quite know how to answer the question, I really don't. I think it was to -- that was put in place to encourage her to participate.

132:8-134:3, McKinley Deposition.  McKinley further testified that he did not know whether the $100.00 per hour to be paid to Ms. Thompson was fair and reasonable compensation for her time.  and 146:6-13, McKinley Deposition [sic].

**ANSWER TO NO. 33.**  Gemini denies that STC's payment to Jennifer Thompson to assist in gathering documents and share her knowledge was improper or made to influence her testimony.   Ms. Thompson was obviously a willing participant to the Mutual Separation Agreement and Release, and it has no materiality with relation to the instant proceeding.  It is interesting to note that RSG paid for Ms. Thompson's transportation and lodging with relation to the trial.  (ECF 367, Golden Decl. Ex. 36, Fee Submission at p. 1 of 155).

34.     After the Receiver was appointed and Ms. Thompson had invoiced STC for the whopping sum of approximately $8,368.71, in the preparation for and the taking of her deposition, Millet contacted the Receiver and questioned the propriety of the Receiver not paying Ms. Thompson's bill, even though she was a pre-receivership creditor.  Dep. Exhibits 601 and 602, attached to Simmons Deposition.  Ms. Thompson's deposition billing included a charge for 68.75 hours for deposition prep with V Polk, document review and search etc from 10/28-11/9/2008.  *Id.*  This arrangement is troublesome on many levels.

**ANSWER TO NO. 34.**  Gemini admits the allegations of No. 34.   The invoices Ms. Thompson presented to STC speak for themselves.   The allegations of No. 34 are objected to as being immaterial to the proceeding at hand.

35.     Gemini induced STC's auditors to book the $600,000 payment held in escrow collaterally securing Golden Parties' warranty obligations to STC as an account receivable of STC, as evidenced by STC's 2006 audited financial statement attached to the Golden Declaration as Exhibit 2, even though Gemini knew that the $600,000 would never be payable to STC, as a

result of Simmons's false statements to Randy on June 21, 2006, which were a complete defense to STC's claims to the escrow, with the result that Gemini caused STC's financial statements to over state STC's assets and stockholder's equity by $600,000, a material misstatement of STC's financial condition.  ¶13, Golden Declaration; 2006 audited STC financials, Exhibit 2 attached to Golden Declaration (*saying*: "During the purchase transaction an escrow deposit of $600,000 was reserved for the buyer and seller. It is considered likely that the Company will receive this escrow due to past reengineering issues from the previous owner."); Exhibit 31, attached to Golden Declaration.

**ANSWER TO NO. 35.**  Denied.  There is no support for the scandalous accusation that independent auditors were "induced" in any way.  Gemini denies the characterization of the $600,000 payment as a payment to be booked as an account receivable to STC was improper.  Obviously, the STC Board of Directors believed that "It is considered likely that [STC] will receive this escrow due to past reengineering issues from the previous owner."  (ECF 358-2, Golden Decl. Ex. 2).  Regardless, it is undisputed that Randy Golden was awarded and has indeed received the $600,000 from the escrow in his judgment against STC.  It is therefore immaterial to the instant proceeding.

36.    Gemini induced STC's auditors to book a $320,072 erroneous understatement of the beginning inventory acquired from Golden Parties, as allocable to good will, rather than correctly increasing the beginning carrying value of the inventory for the mistakenly omitted understatement.  See Note B on page 9-10 of 2006 audited financials (Exhibit 2 to Golden Declaration) (*saying*: "Inventory was originally valued at $1,593,804 in purchase agreement but after further inspection, was determined to be $1,227,392."); ¶13, Golden Declaration; Exhibit 31, attached to Golden Declaration.  The error and its ramifications are explained in an email

dated May 23, 2007 from Sharp to Molly Simmons, Mike Monroe, and David Millet.  See Depo.
Exhibit 23, attached to Sharp Deposition and Exhibit 15 to the Golden Declaration.  According
to Sharp, the final inventory value used in the net working capital adjustment underlying the
Agreement For Purchase Price Adjustment (Exhibit 4) was the correct value to use for the
beginning inventory of STC.  211:17-24, Sharp Deposition.  The figure that Bill Jancosko used
in the final net working capital computation and in the IRS form 8594 filed by STC and the
Golden Parties with IRS was $1,593,803.89 before reduction for the $26,699.56 agreed true up
adjustment.  p 3, Depo. Exhibit 507, attached to Simmons Deposition; Exhibits 2 and 16 attached
to the Golden Declaration.  The beginning inventory that Gemini induced the accountants to use
in the 2006 audited financials was $1,227,392.  Exhibit 2 attached to Golden Declaration.  As a
result of this falsification of the value of STC's beginning inventory, Gemini caused STC to
materially overstate its net income and EBITDA in the 2006 financial statements STC provided
to Randy and Patriot Capital and to falsify STC's compliance with the covenants of its Credit
Agreement with Patriot Capital.  Exhibit 2, attached to Golden Deposition.  Depo. Exhibit 23
attached to Sharp Deposition.

**ANSWER TO NO. 36.**  Gemini asserts the General Objection, *supra*.  Gemini denies
that the evidence relied upon supports the scandalous allegation that it induced STC's
independent auditors to do anything improper.  If the RSG parties believed that the statement of
beginning inventory was improper and somehow defrauded Mr. Golden, such should have been
asserted, but was not, in the underlying proceeding.  It is immaterial to the matter at hand.

37.    Gemini caused STC to make payments of antecedent debt to Gemini of the
following amounts on the dates indicated, as evidenced by the 2007 Cash ledger identified as
Exhibit 11(v) attached to the Golden Declaration:

| DATE | PAYEE | AMOUNT |
|---|---|---|
| 1/19/07 | Gemini Investors IV LP | $36,704.45 |
| 1/19/07 | Gemini Investors III LP | $37,704.45 |
| 4/19/07 | Gemini Investors IV LP | $35,625.00 |
| 4/19/07 | Gemini Investors III LP | $35,625.00 |
| 7/25/07 | Gemini Investors IV LP | $36,020.83 |
| 7/25/07 | Gemini Investors III LP | $36,020.83 |
| | **TOTAL** | **$180,996.11.** |

¶13, Golden Declaration; Exhibit 11(v) attached to Golden Deposition.  At the time that STC made each of the above payments to Gemini, Gemini was deeply involved in the preparation of STC's monthly and annual financial statements and clearly knew or should have known that STC had a negative consolidated total stockholder's equity as of December 31, 2006, and was insolvent at the time of such payments.  See Exhibits 23, 27, and 31 attached to Golden Declaration.  At the time such payments were made to Gemini, the Golden Parties had a claim against STC for 2 trailers and Randy had a claim for past due director fees.  ¶13(m), Golden Declaration; Judgment, Filing No. 302.

**ANSWER TO NO. 37.**  Gemini denies that the interest payments to Gemini were improper or that they were made when STC was insolvent and further denies that the evidence relied upon by RSG supports the allegations.  STC was contractually obligated to make the interest payments to Gemini.  STC was indeed not insolvent at the time these payments were made.  *See* Ex. 1, STC's Audited 2006 Financial Statements and Gemini's Answer to No. 9, *supra*.  *See also* Ex. 2, Excerpts of Sharp Dep. Tr. at 58:2-4, 61:12-18 (testifying that STC was not insolvent); Ex. 3, Sharp Decl. at ¶7 (explaining the change from a 30 or 60-day payable period to a 90-day payable period).

38.   Gemini caused STC to deliver financial statements to Randy that contained less information than the financial statements provided to other STC Directors, as evidenced by the emails attached to the Golden Declaration as Exhibit 17.

**ANSWER TO NO. 38.** The allegation contained in No. 38 is repetitive of an earlier allegation, No. 32, and the same objections and denials stated there are incorporated herein.

39.   Gemini caused STC to be capitalized on a consolidated basis at inception with the grossly inadequate sum of $1,000 of stockholder's equity, as evidenced by the audited 2006 financial statements (Exhibit 2).   See: Depo. Exhibit 573, attached to Simmons Deposition (*saying*: "Gemini lead the leveraged buyout of Sidump'r Trailer Co., . . ."); Exhibit 18 (*saying*: "If my memory serves, we were concerned about cash from the start . . ."). From its inception, STC failed to pay the debts STC owed its vendors as the vendors' debts came due. ¶4, Thompson Declaration (*saying*: "From the inception of Declarant's employment through the date of Declarant's termination, STC generally did not pay its debts to trade creditors as the debts came due as a result of inadequate funds.").

**ANSWER TO NO. 39.** Denied.   *See* Ex. 1, STC's Audited 2006 Financial Statements and Gemini's Answer to Nos. 7 & 9, *supra*.   STC paid its creditors, it simply extended its payables period.

40.   Gemini knowingly causing STC to incur unsecured debt without any reasonable expectation that STC would ever pay such debt, as evidenced by Gemini's attorney's opinion that STC did not have the liquidity to successfully consummate a chapter 11 reorganization attached as Exhibit 19(i) to the Golden Declaration, and notwithstanding the Golden Parties' written demand to cease such conduct, as evidenced by the undated letter that the Golden Parties transmitted to STC and representatives of Gemini, a true and complete copy of which is attached to Exhibit 19(ii) to the Golden Declaration, and a separate letter dated August 27, 2008 from W. Patrick Betterman to Victor H. Polk, former STC legal counsel, a true and complete copy of which is attached as Exhibit 19(iii) to the Golden Deposition.

**ANSWER TO NO. 40.** Victor Polk was not Gemini's attorney. (Ex. 5, Millet Decl. at ¶8). The evidence relied upon by RSG does not even mention "unsecured debt" and the allegations are thus denied.

41. From the inception of STC on January 10, 2006, until a Receiver was appointed for STC's assets on November 20, 2008 Gemini, principally through the actions of Sharp, Simmons, and Millet, operated the Business of STC in disregard of STC's corporate entity by:

a) making the decision whether STC would make payments to its shareholder/creditors in preference to paying other creditors, as evidenced by Exhibit 11(v) attached to the Golden Declaration and the emails and documents attached to the Golden Declaration as Exhibit 20, including 3/3/2007 Sharp email to Gemini (*saying*:

"Virtually all of the major vendors are wanting us to get back to 30 (or even closer) terms given the amount of reordering we are doing and the length of time it has taken for the company to get these long past-due invoices paid. I do not believe that any purchase orders that were called in last week were accepted by the vendors without some dialogue and/or payment in order for the PO to be accepted. It is tough, painstaking and requires a lot of time and follow-up to keep this effort going and "educating the vendors" that we can handle getting back to where we were before the slump hit.");

3/30/2007 email from Robert McKinley to Molly Simmons (*saying*: "However, until we actually collect on more of the March sales units, I would like to suggest, and Michael strongly agrees, that we defer the subordinated debt interest payments. We will hold the payments until you confirm this to be Okay."); and 4/19/2007 email from Robert McKinley to Simmons (*saying*: "Sub debt interest payment wires and checks were released today."); 6/30/2006 email from Simmons to Jennifer Thomson instructing Jennifer Thompson to pay sub debt to insiders, but hold payment of director fees.

and Gemini Update dated April, 2008 (*saying*:

As a result of the liquidity squeeze since early February, the Company has been managing AP further out. Currently there are 6 vendors who will not ship product unless post 60 day balances are paid. This approximates $236k and excludes the negotiated settlements with SSAB, Mailhot, Fasse and Tuthill. The Company is leaking out exactly the amount of AP needed to keep the product going (**i.e. robbing Peter to pay Paul**) although they are now experiencing a product breakdown in "normal flow" and

stockouts as some vendors are not releasing or placing new orders until they receive the check and the funds get credited to their account.

**Decision Required:**

**Are we better off funding the squealers the past due amounts to keep the product flow going or taking the risk that the "Peter's" who we are not paying as previously committed replicate the actions of the squealers?"** [Bold added for emphasis].

b)    making top level pricing decisions for STC products, as evidenced by the emails attached to the Golden Declaration as Exhibit 21;

c)    dealing directly with some of STC's creditors, as evidenced by Scot letter and the email attached to the Golden Declaration as Exhibits 22(i) and 22(ii) [footnote omitted];

d)    overseeing and controlling all accounting functions of STC, as evidenced by the emails attached to the Golden Declaration as Exhibit 23.

e)    hiring STC's chief executive officer in September of 2006, without prior approval of the STC Board of Directors, as evidenced by the emails attached to the Golden Declaration as Exhibit 24;

f)    making unauthorized board decisions on terminating key employees, such as Jennifer Thompson, in May, 2007; See Exhibit 25 to Golden Declaration;

g)    forbidding STC executives from communicating directly with Patriot Capital, STC's primary lender, concerning STC's finances, as evidenced by the emails attached to the Golden Declaration as Exhibit 26;

h)    planning STC's cash expenditures while it was insolvent, including which creditors were to be paid and when they were to be paid, as evidenced by the emails attached to the Golden Declaration as Exhibit 27, and particularly the April, 2008 update quote above about robbing Peter to pay Paul;

i)    hiring and authorizing Sharp at STC's expense to oversee the operations of STC in order to protect Gemini's investment and to provide Gemini periodic confidential reports concerning STC, as evidenced by the emails attached to the Golden Declaration as Exhibit 28;

j)    controlling the assertion of the Counterclaims against the Golden Parties, which Gemini knew to be frivolous in view of Simmons's June 21, 2006 assurances to Randy as evidenced by Exhibit 29 to the Golden Deposition;

k)    choosing STC's attorneys, as evidenced by the emails attached to the Golden Declaration as Exhibit 30;

l)      approving STC's annual audit, as evidenced by the emails attached to the Golden Declaration as 31;

m)      controlling the content of all presentations and submissions to Patriot Capital, STC's primary lender as evidenced by the emails attached to the Golden Declaration as Exhibit 32; Depo. Exhibit 303, attached to the Monroe Deposition;

n)      deciding whether Randy should receive access to plant facilities in accordance with the TSA, as evidenced by the emails attached to the Golden Declaration as Exhibit 33;

o)      deciding whether STC should pursue a lender liability claim against Patriot Capital, as evidenced by the emails attached to the Golden Declaration as Exhibit 34; Depo. Exhibit 652, attached to Simmons Deposition.

p)      approving all material capital expenditure decisions, as evidenced by ¶6 of the Thompson Declaration;

q)      unilaterally appointing Molly Simmons to serve as the Chairman of the Board of Directors of STC without advance approval of the Board in advance as evidenced by the emails attached to the Golden Declaration as Exhibit 35 and Depo. Exhibit 259 attached to the Monroe Deposition;

Gemini operated STC as its agent and mere instrumentality, and used STC as a facade for its own personal dealings as described above.  Exhibits 6, 7, 9, 13(i), 13(ii), 20, 21, 22(i), 22(ii), 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, and 39 to the Golden Declaration.  Depo. Exhibits 573, 584, 585, 591, 595, 598, 599, 600, and 603, attached to the Simmons Deposition; Exhibits 301, 303, 304, 308, 313, and 315 attached to Monroe Deposition; 149:10-12, Monroe Deposition (*saying*: "Gemini -- representatives from Gemini were much more involved than we had planned to be, than would typically be the case in one of our investments.").

**ANSWER TO NO. 41.** Gemini asserts its General Objection, *supra*.   Number 41 contains at least 16 allegations and refers to over 40 exhibits before culminating into an improper legal conclusion.  It is unduly burdensome and frankly impossible to respond.

42.      As a proximate result of Gemini's malicious prosecution and bad faith with respect to the filing of the Counterclaims and the Gemini Lawsuit against the Golden Parties

without probable cause, the Golden Parties incurred legal fees totaling in excess of $906,954.31 in defending against the Counterclaims and the Gemini Lawsuit, as detailed in the compilation attached as Exhibit 36 to the Golden Declaration of the invoices the Golden Parties received and paid for attorney fees and litigation expenses.

**ANSWER TO NO. 42.** The allegation contained in this No. 42 purports to state a claim for relief against Gemini for malicious prosecution and bad faith with respect to filing of the counterclaims in the Gemini Litigation in an attempt to collect legal fees and expenses incurred therein. As this Court previously ruled, RSG may not bring a direct action against Gemini for any torts or other claims for relief. (Gemini Litigation, ECF 102, Mem. & Order at pp. 6-7 of 7). This matter is limited to RSG's attempt to execute on its $104,500 unsatisfied judgment by piercing the corporate veil. Attorneys' fees incurred in the underlying litigation or companion litigation are not properly before the Court at this time as RSG failed to timely seek costs or attorneys' fees under Fed. R. Civ. P. 54 and 59 and L.R. 54.1 and 54.3.

43. Attached to the Golden Declaration as Exhibit 37 is an authentic copy of the Judgment and the separate Order of the District Court of Pierce County, Nebraska appointing Luke Northwall to serve as the Receiver of STC entered on November 18, 2008 in the proceedings captioned *Patriot Capital Funding, Inc. v. Sidump'r Trailer Company, Inc*. pending at Case No. CI-08-86 of the records of the Clerk of the District Court of Pierce County, Nebraska. The Receiver sold all the assets of STC and was discharged pursuant to the Order of the District Court of Pierce County, Nebraska attached to the Golden Declaration as Exhibit 38.

**ANSWER TO NO. 43.** Gemini admits that the Receiver sold all of the assets of STC and was discharged pursuant to the Order of the District Court of Pierce County, Nebraska. Gemini further notes that RSG did not seek any relief from the Receiver or the Receivership in

Pierce County, Nebraska, as would have been appropriate for the majority of the insinuations and allegations made in this proceeding.  (ECF 368-1, Golden Decl. Ex. 28, Judge Kube's Order).

44.     On approximately March 13, 2006, without any formal action of the STC Board of Directors at the time, Molly Simmons, a managing director of Gemini Investors and the representative of Gemini, named Jennifer Thompson the President of STC.  On or about May 17, 2007 Jennifer Thompson's employment was terminated without any action of the Board of Directors of STC at the time.

**ANSWER TO NO. 44.** Gemini is unable to admit or deny whether there was STC-Board action in relation to the hiring of Jennifer Thompson as President of STC or in her termination as RSG has not cited to any evidence in support of this allegation.

45.     On or about September 24, 2006, without any formal board action at the time, Molly Simmons named Robert McKinley to serve as the Chief Executive Officer of STC. Attached to the Golden Declaration as Exhibit 24 is a true and authentic copy of an email and attached Resume Randy received from Molly Simmons on September 24, 2006.

**ANSWER TO NO. 45.**  Gemini denies that there was no STC-Board action in relation to the hiring of Robert McKinley as Chief Executive Officer of STC.  *See* Ex. 5, Millet Decl at ¶9; Ex. 6, 11/26/07 Minutes of STC Board of Directors.

## GEMINI'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     The issues asserted by RSG and Sidump'r for resolution at trial were set forth in the Pre-Trial Order.  (ECF 262, Pre-Trial Order).

2.     Randy Golden did not assert a claim for directors fees in the Pre-Trial Order. (*Id.*).

3.     After a two-week trial, both parties moved for judgment as a matter of law.  (ECF 301, Mem. & Order at p. 3 of 35).

4.    The Court ruled that RSG was entitled to a judgment in its favor on its claim involving the escrow funds and the delivery of the Sidump'r trailers.  (*Id.* at p. 4 of 35).

5.    The Court ruled in favor of STC against RSG on RSG's claims for failure to provide space and failure to develop a Tridump'r trailer.  (*Id.*).

6.    The Court further found that RSG was entitled to a judgment of dismissal on all but two of the buyer's breach of warranty claims.  (*Id.*).

7.    The Court found issues of fact remained on STC's claims for lack of compliance with the warranty of conformity with federal under-ride regulations and the warranty that there had been no material adverse changes in liabilities.  (*Id.*).

8.    The Court found in favor of RSG on all of STC's fraudulent misrepresentation and fraudulent concealment claims except the claim that the seller had either misrepresented or concealed information about substantial or significant cracking problems.  Those claims were submitted to the jury and the jury found in favor of RSG on all of the claims.  (*Id.*).

9.    This Court concluded that neither RSG nor STC was entitled to recover on their equitable claims.  (*Id.* at p. 34 of 35).

10.    RSG's Motion for Judgment As a Matter of Law was granted with respect to its claims for failure to deliver two Sidump'r trailers and its claim for declaration that RSG was entitled to a payment of $600,000 plus interest under the escrow fund.  (*Id.* at 35 of 35).

11.    Judgment was thereafter entered in favor of RSG in the amount of $104,500 plus interest at the legal rate from and after April 16, 2010.  (ECF 302, Judgment).

12.    The Court entered a declaratory judgment that RSG was entitled to payment of the $600,000 plus interest under the escrow fund.  (*Id.*)

13.     The only outstanding, unpaid judgment is the $104,500.  (ECF 369, Br. at ¶23, p. 21 of 44).

14.     RSG has no pending claims against Gemini.  (Gemini Litigation, ECF 102, Mem. & Order at pp. 6-7 of 7).

15.     RSG did not seek taxation of costs in the underlying litigation with STC.  (Docket Sheet at  https://ecf.ned.uscourts.gov/cgi-bin/DktRpt.pl?109715409760692-L_1_0-1, last visited 5/7/12).

16.     RSG did not seek attorney fees in the underlying litigation with STC.  (Docket Sheet at  https://ecf.ned.uscourts.gov/cgi-bin/DktRpt.pl?109715409760692-L_1_0-1, last visited 5/7/12).

17.     RSG did not ever file a petition to intervene or seek any permission from the District Court of Pierce County, Nebraska to intervene in the Receivership.  (ECF 368-1, Golden Decl. Ex. 38, Judge Kube's Order at p. 4 of 9).

18.     RSG had an obligation to assert a preference or other claim in the receivership, even if successful prosecution of such would have inured to the benefit of the secured creditors and not RSG.  RSG chose not to do so.

## STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56, "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The evidence must be viewed in the light most favorable to the non-moving party, giving the non-moving party the benefit of all reasonable inferences.  *Kenney v. Swift Transportation, Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003).  "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations."  *Id.*

The burden of proof is on a creditor to prove, by clear and convincing evidence, that fraud existed in a questioned transaction. *Gifford-Hill & Co. v. Stoller*, 380 N.W.2d 625, 629 (Neb. 1986). "A corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears[.]" *Southern Lumber & Coal Co. v. M.P. Olson Real Estate & Construction Co. Inc.*, 426 N.W.2d 504, 508 (Neb. 1988). A creditor seeking to pierce the corporate veil and impose on a shareholder liability for a corporation's debt has the burden to show by a preponderance of the evidence that the corporate entity must be disregarded to prevent fraud or injustice to the creditor. *Id.* (citations omitted).

## ARGUMENT

### I.      RSG Failed to Meet Its Burden to Prove a Fraudulent Conveyance Or a Basis to Pierce STC's Corporate Veil.

RSG is attempting to collect upon its judgment against STC by alleging (1) a fraudulent conveyance, and (2) a remedy to pierce the corporate veil to force Gemini to pay STC's debt. Based upon black-letter law, RSG has failed to meet its burden under either theory.

#### A.      Fraudulent Conveyance

As the Court will recall, the STC entity operated after the Gemini purchase from early 2006 until STC was put into Receivership on November 20, 2008. (ECF 368, Golden Decl. Ex. 37, Order Appointing Receiver). All of the payments at issue were made pre-Receivership, and constituted interest payments on loans and payments for consulting services. These payments were made in the ordinary course of business, in conjunction with payments many other creditors. *See* 2007 Cash Ledger, Unfiled Ex. 11(v) to ECF 358, Golden Decl. Neither constituted a fraudulent conveyance.

This Court held: "Also, RSG's fraudulent conveyance allegations are more appropriately pursued in a forum such as bankruptcy court or to a receiver." (Gemini Litigation, ECF 102,

Mem. & Order at pp. 7 of 7).   The Receiver obviously had the jurisdiction and the legal obligation to marshal the assets of STC and would have pursued Gemini and Sharp if there were any merit to RSG's allegations.  (ECF 368, Golden Decl. Ex. 37, Order Appointing Receiver).  RSG's counsel acknowledged this in written correspondence to Gemini: "As you must know, the pierce the corporate veil claim and mismanagement claims against Gemini and Molly Simmons described in Randy's demand letter are property of the estate of Sidump'r."  (ECF 363-5, Golden Decl. Ex. 19(iii), 8/27/08 Letter to Polk from Betterman at p. 2 of 2).  RSG neither made such a claim nor asked the Receiver to make such claim in the Receivership.  (ECF 368-1, Golden Decl. Ex. 38, Judge Kube's Order).  Instead, RSG challenged the propriety and legality of the Receivership, a challenge RSG lost, but failed to appeal.  (ECF 368-1, Golden Decl. Ex. 38, Judge Kube's Order).

Obviously, if the Receiver clawed back any preferences, such would have inured to the benefit of the secured creditors and RSG would not have gotten anything.  RSG knows this, and this attempt is nothing more than an end run around that reality.  Even if it was procedurally appropriate to assert this claim in this Court, it fails substantively, as set forth below.

       *1.    Interest payments to Gemini.*

RSG claims that interest payments made to Gemini on its loans to STC constitute fraudulent conveyances because it alleges STC was insolvent when the interest payments were made.  (ECF 369, Br. at p. 35-36 of 44).  In support of its insolvency allegation, RSG cites to STC's 2006 audited financial statements.  (*Id.*, citing Golden Decl. Ex. 2 (ECF 358-2)).

The document to which RSG cites is an incomplete copy of the STC audited financial statements for the period ending December 31, 2006, wherein RSG has omitted the page delineating STC's assets.  A review of the complete financial statement demonstrates that RSG's argument is completely unfounded.  (Ex. 1, STC's Audited 2006 Financial Statements).  There

was $549,355 of cash on the balance sheet on December 31, 2006. *Id.* The current ratio[3] was 1.16, which represents a clean bill of health for STC, as it means for every dollar of current liabilities, there was $1.16 of current assets. There was an additional $320,000 available to the company from its senior lender. *Id.* The income from operations for calendar year 2006 was $1,595,082, and the company paid down its bank debt that same year by $865,875. *Id.* STC had inventory of at least 100 trailers to be sold at net $12,000 to $15,000, for additional liquidity of at least $1.2M to $1.5M. (Ex. 2, Excerpt of Sharp Dep. Tr. at 61:12-18). The complete financial picture, by no measure, is one of insolvency, and RSG has not adduced any evidence to show it had changed to a significant decree, and certainly has not proven that STC was insolvent as a matter of law.

RSG next claims that STC's interest payments to Gemini constitute fraudulent transfers, again relying upon Ex. 2 of the Golden Declaration (ECF 358-2), and because Gemini knew of STC's "precarious financial position," citing to Golden Declaration Exhibits 23 (364-3), 27 (not ECF-filed), and 31 (ECF 366-2). These exhibits number a total of 250 pages (50, 105, and 95 pages, respectively). RSG does not indicate by pinpoint cite in its argument or in its corresponding "Separate Statement of Material Facts" No. 29 what information within the 250 pages allegedly supports its argument. Neither the Court nor Gemini should be forced to "search the record in an effort to determine whether there exists dormant evidence[.]" *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")); *see* L.R. 56.1 ("Failure to provide citations to the exact locations in the record supporting the factual allegations may be grounds to deny the motion.") (emphasis in original).

---

[3] The current ratio is a common diagnostic of business liquidity (current assets/current liabilities).

RSG cites *J.L. Brock Builders, Inc. v. Dahlbeck*, 391 N.W.2d 110 (Neb. 1986), for the proposition that "An insolvent corporation cannot make preferential debt payments or dividend distributions to a controlling shareholder." (ECF 369, Br. at 39 of 44). *Dahlbeck* does not stand for this proposition. In that case, Mr. Dahlbeck was the sole shareholder of a real estate business that ultimately failed. Upon winding up the business of the corporation, rather than paying any debtors, Mr. Dahlbeck transferred all of the net worth of the corporation to himself, claiming it was repayment for an (undocumented) loan. *Id.* at 116-17.

RSG has failed to prove the impropriety of paying Gemini interest payments on its loans, or that such payments were made when STC was insolvent. At the same time these interest payments were being made, STC was also making interest payments to its senior lender and many other creditor vendors (2007 Cash Ledger, Unfiled Ex. 11(v) to ECF 358, Golden Decl.), conduct which RSG obviously does not find objectionable. At no time did STC pay any dividends to any shareholders or make any preferred debt payments to shareholders, such as what happened in *Dahlbeck*. As the check register shows, payments were being made on an ongoing basis in the ordinary course of STC's business, and there is no evidence to suggest otherwise.

RSG is essentially arguing that payments made by STC to its creditors, *i.e.,* Gemini for its interest on its loans and Mr. Sharp for his consulting services, constituted a preference. A preference would have to be avoided by the Receiver, paid to secured creditors in due course, with no benefit to RSG. Thus, knowing that a preference action would have to be pursued in the Receivership or in a bankruptcy, RSG has cloaked these legitimate payments as fraudulent transfers, contrary to the law, and this Court's ruling. RSG's argument fails as a matter of law.

B.    Pierce Corporate Veil

    1.    *Remedy not a Cause of Action*

RSG is attempting to recover directors fees allegedly owed Randy Golden as well as attorneys fees and costs incurred in the STC litigation. Veil-piercing is a remedy, not a cause of action. 36 *Causes of Action 2d* 441 (2008). A party attempting to pierce a corporate veil or collect under an alter ego theory is entitled to recover only those amounts which have been entered as a judgment against the judgment debtor, here, STC. This is so because piercing the corporate veil is a means of imposing liability on an underlying cause of action. 1 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.28. Thus, RSG may only attempt to collect the unpaid judgment of $104,500.

The balance of the relief sought by RSG is unavailable because RSG failed to even allege such a claim for relief against STC,[4] and this Court previously ruled that RSG may not pursue Gemini directly. (Gemini Litigation, ECF 102, Mem. & Order at pp. 6-7 of 7).

 2. *Standard for Piercing the Corporate Veil*

The Nebraska Supreme Court set forth the standard to pierce the corporate veil in *Christian v. Smith*, 759 N.W.2d 447, 462-463 (Neb. 2008). The *Christian* court articulated the tenet that a corporation is viewed as being a separate entity from its shareholders and officers, who are generally not liable for the debts and obligations of the corporation. *Id.* at 462. A corporation's identity is disregarded only when the corporation was "used to commit fraud, violate a legal duty, or perpetrate a dishonest or unjust act in contravention of the rights of another." *Id.* (footnote omitted). RSG must prove that STC was under the actual control of

---

[4] Randy Golden claims he is entitled to directors fees owed by STC, yet he did not plead that claim for relief in the STC litigation. (ECF 262, Pre-Trial Order at pp. 3-6 of 162). As for the attorney fees incurred in the STC litigation, RSG failed to move for fees under Fed. R. Civ. P. 54, and thus waived its right to seek fees. *See Logue v. Dore,* 103 F.3d 1040, 1047 (1st Cir. 1997) ("Moreover, the defendant effectively waived the right to attorneys' fees by his conceded failure to file and serve a properly supported application within fourteen days of the entry of judgment.").

Gemini and that Gemini exercised such control to commit a fraud or other wrong in contravention to STC's creditor's rights.  *Id.*  RSG therefore must show that the corporate identity was disregarded in order to perpetuate a fraud or injustice to STC's creditors.  *Id.*

The fact that two or more corporations have the same shareholders or officers, or both, does not destroy their character as distinct entities.  1 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 25 (collecting cases).  The mere ownership of the capital stock of one corporation by another does not create an identity of corporate interest between the two companies or create the relationship of principal and agent, or representative or alter ego between the two.  *Id.* at § 26.  A parent corporation does not lose the benefits of limited liability by taking an active interest in the affairs of its subsidiary, by using its voting power to elect directors, or by entering into contracts with the subsidiary, so long as the corporate formalities are observed.  *Id.*

The mere fact that a business ultimately failed is not a basis to pierce.  Rather, the relevant factors in assessing whether to disregard the corporate entity on the basis of fraud are:

> (1) grossly inadequate capitalization;
> (2) insolvency of the debtor corporation at the time the debt is incurred;
> (3) diversion by the shareholder or shareholders of corporate funds or assets to their own or other improper uses; and
> (4) the fact that a corporation is a mere façade for the personal dealings of the shareholder and that the operations of the corporation are carried on by the shareholder in disregard of the corporate entity.

*Id.* (footnote omitted).  The few relevant allegations in RSG's Brief are insufficient as a matter of law and / or unsupported by evidence competent to pierce the corporate veil under Nebraska law.

> a.      RSG has not proven grossly inadequate capitalization.

The *Christian* court explained inadequate capitalization as meaning capitalization very small in relation to the nature of the business of the corporation and the risks entailed.  *Christian*, 759 N.W.2d at 463.  Whether the corporation was inadequately capitalized is measured at the

time of incorporation.  *Id.*  If STC was adequately capitalized when formed but later suffered losses, it is not necessarily insolvent.  *Id.*

RSG again relies exclusively upon STC's audited 2006 financial statement in its claim of inadequate capitalization.  RSG alleges that Gemini incorporated STC with only $1,000 of stockholder's equity.  This is not an accurate statement and ignores the entire audited 2006 financial statements and particularly the capital relating to the preferred stock.  The preferred stock is treated by accountants as debt, but the preferred shares are a financial instrument that has characteristics of both debt (fixed dividends) and equity (potential appreciation).  In the event of bankruptcy or liquidation of the company's assets, there is always substantial risk that there will be nothing left after paying senior secured creditors, as happened in this matter, hence, they must be included in the inquiry regarding adequate capitalization.  (Ex. 5, Millet Decl. at ¶4).

A review of the complete audited financial statement demonstrates that RSG's argument is completely unfounded.  (Ex. 1, STC's Audited 2006 Financial Statements).  There was $549,355 of cash on the balance sheet on December 31, 2006.  *Id.*  The current ratio[5] was 1.16, which represents a clean bill of health for STC, as it means for every dollar of current liabilities, there was $1.16 of current assets.  There was an additional $320,000 available to the company from its senior lender.  *Id.*  The income from operations for calendar year 2006 from these same audited statements was $1,595,082, and the company paid down its bank debt by $865,875.  *Id.* STC had a backlog of at least 100 trailers to be sold at net $12,000 to $14,000, for additional liquidity of at least $1.2M to $1.5M.  (Ex. 2, Excerpts of Sharp Dep. Tr. at 61:12-18).  *See Global Credit Svcs., Inc. v. AMISUB*, 508 N.W.2d 836, 843 (Neb. 1993) ("The authorization to issue capital stock . . . should not be confused with formal minimum paid-in capital requirements

---

[5]  The current ratio is a common diagnostic of business liquidity (current assets/current liabilities).

and, more importantly, does not reflect the ability [of a corporation] to conduct its business.")
(citing 11 William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 5124
(rev. perm. ed. 1986) (other citation omitted.)).

RSG fails to articulate in any fashion how STC's financial statement demonstrates
inadequate capitalization, let alone "grossly" inadequate capitalization, as required under the law.
This factor cannot be met.

> b.   RSG has not established insolvency of STC at the time a debt was
> incurred.

"A corporation is insolvent if it is unable to pay debts as they become due in the usual
course of its business, or if it has an excess of liabilities of the corporation over its assets at a fair
valuation." *Global Credit*, 508 N.W.2d at 884.  RSG alleges that the $104,500 judgment arose
from STC's failure to deliver two trailers in 2006, and such failure evidences that STC was "not
paying its debts as they came due . . . and was therefore insolvent at that time." (ECF 369, Br. at
p. 39 of 44).  STC's defense to the breach of contract at trial was not that it was insolvent, but
rather that the claims were barred by waiver, prior material breach, ratification, estoppel, fraud,
misrepresentation, unclean hands, failure of consideration, unjust enrichment, or rescission.
(ECF 262, Pre-Trial Order at pp. 6-9 of 162).  The dispute about the trailers does not lend any
support to this factor.

RSG further argues STC was insolvent because it struggled with flagging sales in the
dismal economy of 2007 and 2008 and was correspondingly lower on receivables.  As Mr. Sharp
testified, causing accounts payable to be stretched to a 90-day calendar instead of a 30 or 60-day
calendar was commonplace.  *See* Ex. 3, Sharp Decl. at ¶¶7-8.  Ironically, none of the documents
RSG relies upon assist it in this argument, but they *do* show that RSG was paying creditors on an

ongoing basis.  *See, e.g.*, 2007 Cash Ledger, Unfiled Ex. 11(v) to ECF 358, Golden Decl.  RSG

can point to no creditor action taken against STC during the pertinent time period.

This factor cannot be met.

     c.  RSG has not proven any shareholder diverted STC corporate funds
        or assets to their own or other improper uses.

RSG must prove that a shareholder appropriated corporate funds and property for its

personal purposes.  There is no evidence to support this factor.

Michael Sharp was hired to oversee the operations of STC.  RSG complains that Mr.

Sharp should have been paid by Gemini, not STC.  RSG fails to mention that Mr. Sharp's

services were undertaken for STC's benefit.  Mr. Sharp was retained to perform a full assessment

and audit of STC, which included, among other tasks and functions, the following:

- Conducted a market assessment, including visits with most of STC dealers along with Jennifer Thompson, STC's acting President.

- Addressed the ongoing product warranty and production issues that STC was experiencing.

- Conducted a market pricing strategy evaluation and gross margin analysis.

- Assembled a 2007 forecast and performed baseline projections for 2008.

- Resolved the late 2006-early 2007 liquidity crunch.

- Ramped up production and as a result, the productivity curve showed significant improvement.

- Worked with new CEO to help uncover and fix several ongoing product quality and stabilization issues.

- Reevaluated selling strategy and personnel.

- Worked with new CEO to help effectuate major damage control to dealer relationships.

- Worked with new CEO to reengineer the selling process to manage dealer communications, part sales, production planning, and warranty issues more effectively.

- Worked with new CEO to:

  - hire materials management personnel and reengineer buying strategy and methodology.

  - Manage over $570,000 of warranty and related expenses in addition to funding the base business.

  - Recruit and fill the controller position.

  - Upgrade the system platform including new server and hardwiring.

- Through June 2007, STC performed better than the 2007 budget as to cash balances and availability.

(ECF 365, Golden Decl. Ex. 28 at pp. 44 & 46 of 177; Ex. 3, Sharp Decl. at ¶¶5-6).

This employment arrangement is not inappropriate, is permitted, and is not foundation to pierce. Merely taking an active part in the management of a corporation does not automatically constitute control sufficient to pierce the corporate veil. In *Global Credit*, 508 N.W.2d at 844, the Nebraska Supreme Court reiterated long-standing law that a shareholder / creditor could appoint one of its employees to work for the primary company. Doing so does not meet the criteria to pierce because the creditor's oversight of the operations of a debtor business did not warrant a finding that the creditor was carrying on the business of the debtor as a part of its own business. *Id.* (citation omitted).

Moreover, as argued earlier in this section, STC obviously benefitted from Mr. Sharp's involvement.

This factor cannot be met.

> d. RSG has not proven that STC was a mere façade for the personal dealings of Gemini and that the operations of STC were carried on by Gemini in disregard of the corporate entity.

"The separate entity concept of the corporation may be disregarded where the corporation is a mere shell, serving no legitimate business purpose, and is used as an intermediary to

perpetuate fraud on the creditors." *Christian*, 759 N.W.2d at 463 (footnote omitted).   In the *Christian* case, the judgment debtor testified that he was the sole shareholder, officer, and member of the board of directors of the entity.   The *Christian* court noted "but this, in itself, is insufficient to show that [corporate entity] was a mere shell to perpetrate fraud." *Id.* at 463.

RSG has not proven that STC was a mere shell, or that it served no legitimate purpose, or that it was used as an intermediary to perpetuate a fraud on the creditors.   In fact, RSG concedes that Holdings formed STC for the purpose of acquiring the trailer manufacturing business known as Sidump'r Trailer Company.   (ECF 326, Mot. at ¶3).

None of the allegations set forth in RSG's Brief rise to the level of proof required by the fourth prong of the test.   Corporate records for STC clearly demonstrate that STC was always treated as a separate entity.   *See, e.g.,* Corporate records at ECF 199 (employee roster, balance sheets, financial statements, etc.).   Furthermore, Mr. Sharp's testimony demonstrates that all actions were being taken for the benefit of STC.   (ECF 365, Golden Decl. Ex. 28 at pp. 44 & 46 of 177; Ex. 3, Sharp Decl. at ¶¶5-6).

## CONCLUSION

Based on the foregoing, Plaintiffs' Motion for Summary Judgment should be denied.

Dated this 9th day of May, 2012.

GEMINI INVESTORS III, L.P. and
GEMINI INVESTORS IV, L.P.,

By: /s/ *Nora M. Kane*
     Mark J. Peterson, #18850
     Nora M. Kane, #21562
     STINSON MORRISON HECKER LLP
     1299 Farnam Street, 15th Floor
     Omaha, Nebraska  68102-1818
     Phone:  (402) 342-1700
     Fax:     (402) 930-1701
     mpeterson@stinson.com
     nkane@stinson.com

ATTORNEYS FOR
GEMINI INVESTORS III, L.P. and
GEMINI INVESTORS IV, L.P.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 9th day of May, 2012, I electronically filed the foregoing document using the CM/ECF system, which sent notice of such filing to all CM/ECF-registered counsel of record.

/s/ *Nora M. Kane*
Nora M. Kane